[Cite as *State v. Hall*, 2018-Ohio-2321.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27695 |
| | : | |
| v. | : | T.C. NO. 2016-CR-553 |
| | : | |
| MICHAEL J. HALL, III | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 15th day of June, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee


CARLO McGINNIS, Atty. Reg. No. 0019540, 55 Park Avenue, Oakwood, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant, Michael J. Hall, III, appeals his conviction and sentence for the following offenses, to wit: Count I: possession of criminal tools, in violation of R.C. 2923.24(A), a felony of the fifth degree; Count II: possession of cocaine, in violation of R.C. 2925.11(A) and (C)(4)(e), a felony of the first degree, accompanied by a one-year firearm specification; Count III: possession of drug paraphernalia, in violation of R.C. 2925.14(C)(1), a misdemeanor of the fourth degree; Count IV: improper handling of a firearm in a motor vehicle, in violation of 2923.16(B), a felony of the fourth degree; and Count V: carrying a concealed weapon, in violation of R.C. 2923.12(A)(1), a felony of the fourth degree.   Hall filed a timely notice of appeal with this Court on August 16, 2017.

{¶ 2} The incident which forms that basis for the instant appeal occurred on December 7, 2015, at approximately 7:17 p.m., when Officer Eric Lane, a ranger for the Five Rivers MetroParks, was on patrol in a marked police cruiser in the area near Wesleyan MetroPark in Dayton, Ohio; he observed a Chevrolet Impala run a stop sign located at the intersection of Wesleyan Road and Princeton Drive.   The intersection where Officer Lane observed the traffic infraction is an area that is adjacent to park grounds.   Officer Lane testified that, as a MetroParks ranger, he has jurisdiction over criminal offenses committed on park grounds and on property adjacent to park grounds. In order to avoid traffic congestion, Officer Lane did not initiate a traffic stop of the Impala, driven by an individual later identified as Hall, until the vehicle reached the intersection of Cornell Drive and Otterbein Avenue, one street over, at approximately 7:20 p.m.

{¶ 3} After running the license plate number through his computer, Officer Lane

approached the vehicle's front passenger window and obtained Hall's license, registration, and insurance information. Upon returning to his cruiser, Officer Lane contacted dispatch and requested a K-9 unit to respond to the scene to perform a free-air sniff around Hall's vehicle. The dispatcher indicated that the K-9 unit was currently in Huber Heights. Officer Lane testified that he informed dispatch that it would take too much time for the K-9 unit to arrive. The dispatcher responded that he had located another K-9 unit in west Dayton in Officer Lane's immediate vicinity. Officer Lane's exchange with the dispatcher lasted from 7:22 to 7:24 p.m. Officer Lane requested that the K-9 unit respond to his location. Officer Lane testified that he requested the K-9 unit because Hall was acting overly nervous upon being stopped. Specifically, Officer Lane observed that Hall slammed the glove box after removing his proof of insurance card, as if he did not want Officer Lane to see what was inside. Officer Lane also testified that Hall's hands were shaking when he handed over his insurance card.

**{¶ 4}** After successfully requesting the K-9 unit, Officer Lane entered Hall's information into the LEADS database and the Dayton Police Department's "MIS" system. Officer Lane testified that entering Hall's information took approximately three to four minutes. Thereafter, Officer Lane testified that he began writing Hall's citation for the stop sign violation. The trial court found that Officer Lane began writing the citation at approximately 7:25 p.m. Officer Lane testified that unlike other jurisdictions, Five Rivers MetroParks does not provide its rangers with citations that contain template or "pre-loaded" information. Thus, Officer Lane had to fill out all of the information in Hall's citation by hand. Furthermore, because he patrolled multiple jurisdictions, Officer Lane testified that he had to verify that Hall's citation referenced the correct court. Accordingly,

Officer Lane testified that it generally takes him longer to complete a traffic citation than it does for an officer from a municipal police department.

{¶ 5} At approximately 7:42 p.m., Officer Robert Cleaver of the Dayton Police Department arrived at the scene with his K-9 unit, Phantom. When Officer Cleaver arrived, Officer Lane was in the process of completing Hall's citation. Officer Lane testified that he stopped working on the uncompleted traffic citation at approximately 7:43 and removed Hall from his vehicle so that Officer Cleaver could perform a free-air sniff with Phantom. At approximately 7:44 p.m., Phantom alerted to the presence of narcotics in Hall's vehicle. The trial court found that only nineteen minutes had passed between the time Officer Lane began writing Hall's citation and when Phantom began the free-air sniff.

{¶ 6} Once Phantom alerted, Officer Lane testified that he had probable cause to search Hall's vehicle. Officer Lane also testified that he patted Hall down and recovered approximately $700.00 from his person. The officers searched the passenger compartment of Hall's vehicle and ultimately discovered a loaded .22 caliber handgun in the center console. Without being questioned, Hall admitted that he "keeps that [the gun] for protection." Officer Lane then asked if he had a CCW permit, and Hall stated that he did not have a permit to carry a concealed weapon. Hall was arrested, handcuffed, and placed in the back of Officer Lane's cruiser. As he was being placed in the cruiser, Hall spontaneously made the following statements, to wit: 1) "Lord, Lord, Lord, I done f*** up"; 2) "All my sh***, f***"; and 3) "I really f*** up." The statements were recorded by audio equipment inside the cruiser.

{¶ 7} Upon resuming their search of the vehicle, the officers discovered cocaine,

pills, and various pieces of drug paraphernalia. Thereafter, Officer Lane read Hall his *Miranda* rights, and Hall indicated to Officer Lane that he understood each right. While Hall was being transported to the Montgomery County Jail, Hall made admissions regarding the contraband found in his vehicle. While in jail, Hall was questioned by Detective Jeremy Fritz. Detective Fritz testified that he provided Hall with his *Miranda* warnings. Hall signed the pre-interview waiver of rights form and agreed to speak with Detective Fritz. Detective Fritz testified that he questioned Hall for approximately thirty minutes, during which Hall made several admissions. At no point during the interview did Hall request an attorney.

{¶ 8} On April 25, 2016, Hall was indicted for the following offenses, to wit: Count I: possession of criminal tools; Count II: possession of cocaine, accompanied by a one-year firearm specification; Count III: possession of drug paraphernalia; Count IV: improper handling of a firearm in a motor vehicle; and Count V: carrying a concealed weapon. At his arraignment on June 7, 2016, Hall stood mute, and the trial court entered a plea of not guilty on his behalf.

{¶ 9} On June 21, 2016, Hall filed a motion to suppress the statements he made to the police before and after he was arrested. In a separate motion to suppress filed the same day, Hall sought to exclude any evidence seized during the search of his person and his vehicle. Hall also filed a motion to dismiss based upon pre-indictment delay and a motion for independent analysis of the drugs seized from his vehicle. Shortly thereafter, on June 26, 2016, Hall filed a motion for the appointment of a defense investigator, which the trial court granted one day later on June 27, 2016. On June 28, 2016, the trial court granted Hall's motion for independent drug analysis.

{¶ 10} A hearing was held on Hall's motions to suppress on July 6 and July 14, 2016. On July 19, 2016, Hall filed a supplemental motion to suppress in which he argued that his statements to the police officers at the scene were involuntary and that he did not validly waive his *Miranda* rights. On July 20, 2016, the trial court held a hearing on Hall's motion to dismiss.

{¶ 11} In a decision issued on August 17, 2016, the trial court sustained in part and denied in part Hall's motions to suppress. Specifically, the trial court found that the statements made by Hall while in the back of the cruiser before the police informed him of his *Miranda* rights were suppressed, while the statements he made after being read his *Miranda* rights were admissible. Notably, the trial court found that the spontaneous statements made by Hall after being arrested but before being placed in the cruiser were admissible. Furthermore, the trial court found that the traffic stop and the subsequent search of Hall's vehicle were lawful and supported by probable cause. On the same day, the trial court also denied Hall's motion to dismiss, finding that he failed to adduce any evidence that he suffered prejudice as a result of the pre-indictment delay.

{¶ 12} Hall filed additional supplemental motions to suppress on November 3 and 30, 2016, arguing that the evidence seized from his vehicle was only discovered after an unreasonably prolonged detention because of the time it took for the K-9 unit to arrive at the scene. On December 9, 2016, a hearing was held before the trial court on Hall's supplemental suppression motions. These motions were denied on March 6, 2017.

{¶ 13} On January 23, 2017, Hall filed a motion to dismiss Count II of the indictment, possession of cocaine, based upon the Ohio Supreme Court's decision in *State v. Gonzales*, 150 Ohio St.3d 261, 2016-Ohio-8319, 81 N.E.3d 405 (hereinafter

referred to as "*Gonzales I*") (holding that the offense level for possession of cocaine was determined only by weight of actual cocaine, not by total weight of cocaine plus any filler). Prior to the hearing on Hall's motion to dismiss Count II, the State orally requested leave to dismiss Count II without prejudice. Nevertheless, on February 14, 2017, the trial court held a hearing on Hall's motion to dismiss Count II. The parties filed post-hearing memoranda on February 24, 2017. On March 6, 2017, the Ohio Supreme Court issued an opinion vacating its previous decision in *Gonzales I*, holding that the entire compound, mixture, preparation, or substance was to be considered in determining the appropriate penalty for the offense of cocaine possession. *State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419 (hereinafter referred to as "*Gonzales II*"). On the same day, the State withdrew its oral motion to dismiss Count II.

{¶ 14} Thereafter on June 14, 2017, Hall pled no contest to all of the offenses in the indictment, and the trial court found him guilty on all counts. On June 21, 2017, Hall filed an "affidavit of indigency." At disposition on July 27, 2017, the trial court sentenced Hall to a total mandatory term of four years in prison; it also imposed a mandatory fine of $10,000.00 for his conviction of possession of cocaine.

{¶ 15} It is from this judgment that Hall now appeals.

{¶ 16} Because they are interrelated, Hall's first, third, fourth, fifth, and sixth assignments of error will be discussed together as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION(S) TO SUPPRESS.

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FOUND THAT OFFICER LANE DILIGENTLY PROCESSED THE

SUBJECT TRAFFIC TICKET COMPLAINT.

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FOUND THAT THE SUBJECT DOG SNIFF TOOK PLACE WITHIN AN ORDINARY TIME FRAME FOR PROCESSING A ROUTINE TRAFFIC TICKET STOP.

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO FIND THAT ANY OF OFFICER LANE'S ACTIONS SERVED TO PROLONG THE ROUTINE TRAFFIC STOP IN ORDER TO PROCESS THE SUBSEQUENT DOG SNIFF.

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE FRUITS OF A WARRANTLESS SEARCH AND THEREBY PRECLUDED DEFENDANT'S CONSTITUTIONAL RIGHTS OF DUE PROCESS AND TO BE FREE FROM UNREASONABLE SEARCHES UNDER THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶ 17} In the foregoing assignments, Hall essentially contends that the trial court should have granted his motions to suppress any physical evidence and/or statements because the traffic stop was unreasonably extended for the sole purpose of a canine sniff.

{¶ 18} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015–Ohio–

1326, ¶ 13, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003–Ohio–5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *State v. Gordon*, 5th Dist. Fairfield No. 14–CA–13, 2014–Ohio–5027, ¶ 14, citing *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

{¶ 19} "When an officer detains a motorist for a traffic violation, the stop should delay the motorist only for the amount of time necessary to issue a citation or warning." *State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 9, citing *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12. "The reasonable stop time includes the amount of time it takes to conduct a computer check on the driver's license, registration, and vehicle plates." *Id.* " 'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.*, quoting *Batchili*.

{¶ 20} Nevertheless, official "conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), quoting *United States v. Jacobsen*, 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court held that the use of "a well-trained narcotics-detection dog" to examine

unopened personal luggage "did not constitute a 'search' within the meaning of the Fourth Amendment" because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search," and because such an examination "discloses only the presence or absence of narcotics, a contraband item." *See also Jacobsen*, 466 U.S. at 121-123 (finding no legitimate privacy interest in the possession of contraband). Relying on its holding in *Place*, the Court found in *Caballes* that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." *Caballes*, 543 U.S. at 408.

## Length of Detention

{¶ 21} Hall's overarching argument on appeal regarding the trial court's denial of his collective motions is that the traffic stop had been unreasonably prolonged by the time the K-9 unit performed a free-air sniff and alerted to the presence of drugs inside his vehicle.

{¶ 22} In *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), a K–9 officer stopped Rodriguez for driving on the highway shoulder, a violation of Nebraska law. After checking Rodriguez's and his passenger's identification and issuing a warning to Rodriguez, the officer asked Rodriguez for permission to walk a canine around the vehicle. When Rodriguez refused, the officer detained him until a second officer arrived, and then the officer walked a canine around the vehicle. The dog altered to the presence of drugs in the vehicle. Seven or eight minutes elapsed between the issuance of the warning and when the dog alerted.

{¶ 23} The U.S. Supreme Court held that "a police stop exceeding the time needed

to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez*, 135 S.Ct. at 1612, citing *Caballes*, 543 U.S. at 407.

**{¶ 24}** Recently, in *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276 (2d Dist.), we addressed whether the trial court had erred in suppressing drug-related evidence found through a canine sniff during a traffic stop. In *Hall*, the officer requested a K-9 unit while in the process of confirming Hall's identity. After confirming Hall's identity, the officer "did nothing to process the traffic stop for approximately eight minutes," even though he had all of the information that he needed to complete a citation. After the dog arrived, it alerted to the presence of drug-related contraband. The trial court suppressed the evidence. On appeal, the State argued that the sniff had occurred within the amount of time (12–13 minutes) deemed reasonable for a traffic stop. The State thus claimed that the drug sniff did not unlawfully extend the stop. We rejected this argument and affirmed the trial court's suppression ruling.

**{¶ 25}** In rejecting the State's argument in *Hall*, we stated that the U.S. Supreme Court "made clear in *Rodriguez* that an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.'" *Hall* at ¶ 13, quoting *Rodriguez*, 135 S.Ct. at 1616. We explained:

Notably, the *Rodriguez* majority explicitly rejected the government's argument that an officer may "incrementally" prolong a stop to perform a

drug sniff provided he "is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances." [*Rodriguez*] at 1616. The Court emphasized that reasonableness "depends on what the police in fact do," and diligence is measured "by noting what the officer actually did and how he did it." *Id.* The "critical question" in each case is "whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.' " *Id.*

*Hall* at ¶ 10.

{¶ 26} In *State v. Matheney*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, we held that a canine sniff did not unreasonably extend the time for a traffic stop where the dog alerted 24 to 26 minutes after the stop. Although the officer involved testified that it normally took him 12 to 15 minutes to issue citations, the defendant's actions prolonged the stop by forcing the officer to conduct a pat down for his safety. *Id.* at ¶ 30. In finding the duration of the stop permissible, we reasoned:

> * * * [I]n the time before the canine sniff was conducted, Officer Sanford remained busy preparing Matheney's traffic citation, which he had not yet completed when the canine unit arrived. Moreover, under the specific facts of this case, we do not find that 24 to 26 minutes is an unusual length of time for the traffic stop in question given that Matheney engaged in conduct warranting a pat-down search.
>
> Because Sanford was not simply waiting for the canine unit to arrive, but rather running Matheney's information through his computer, patting down

Matheney for weapons after his abrupt movement toward the back seat of the vehicle, and preparing Matheney's traffic citations, we find that under the circumstances, Sanford diligently conducted the investigation within a reasonable amount of time. Accordingly, under the totality of the circumstances, we do not find that Matheney's detention was extended beyond what was reasonably necessary to resolve the issues associated with the traffic stop and to issue a traffic citation.

{¶ 27} In the instant case, Officer Lane initiated the stop of Hall's vehicle at approximately 7:20 p.m. Officer Lane approached Hall's vehicle approximately one minute later and asked him for information. Officer Lane then returned to his cruiser, began entering Hall's information into his computer, and requested that a K-9 unit be dispatched to the scene to perform a free-air sniff around Hall's vehicle. The dispatcher indicated that the K-9 unit was currently in Huber Heights. Officer Lane testified that he informed dispatch that it would take too much time for the K-9 unit to arrive. The dispatcher responded that he had located another K-9 unit in west Dayton in Officer Lane's immediate vicinity. Officer Lane's exchange with the dispatcher lasted from 7:22 to 7:24 p.m. Officer Lane requested that the K-9 unit respond to his location. Officer Lane testified that he requested the K-9 unit because Hall was acting overly nervous upon being stopped. Specifically, Officer Lane observed that Hall slammed the glove box after removing his proof of insurance card, as if he did not want Officer Lane to see what was inside.

{¶ 28} After successfully requesting the K-9 unit, Officer Lane entered Hall's information into the LEADS database and the Dayton Police Department's "MIS" system.

Officer Lane testified that entering Hall's information took approximately three to four minutes. Thereafter, Officer Lane testified that he began writing Hall's citation for the stop sign violation. The trial court found that Officer Lane began writing the citation at approximately 7:25 p.m. As previously stated, Five Rivers MetroParks does not provide its rangers with citations that contain template or "pre-loaded" information, thereby requiring Officer Lane to fill out all of the information in Hall's citation by hand. Furthermore, because he patrolled multiple jurisdictions, Officer Lane testified that he had to verify that Hall's citation referenced the correct court. Accordingly, Officer Lane testified that it generally takes him longer to complete a traffic citation than it does for an officer from a municipal department.

{¶ 29} At approximately 7:42 p.m., Officer Cleaver arrived with his K-9 unit, Phantom. When Officer Cleaver arrived, Officer Lane testified that he was still completing Hall's citation. Officer Lane testified that he stopped working on the traffic citation at approximately 7:43 and removed Hall from his vehicle so that Officer Cleaver could perform a free-air sniff with Phantom. At approximately 7:44 p.m., Phantom alerted to the presence of narcotics in Hall's vehicle. The trial court found that only 19 minutes had passed between the time Officer Lane began writing Hall's citation and when Phantom began the free-air sniff.

{¶ 30} Unlike the police officer in *Hall*, 2017-Ohio-2682, 90 N.E.3d 276, who "did nothing to process the traffic stop for approximately eight minutes" while he waited for a K-9 unit to arrive, Officer Lane acted reasonably and diligently by confirming Hall's identification and working on his citation before, during, and after the K-9 unit began its sniff around the vehicle. Officer Lane was not simply waiting for the K-9 unit to arrive nor

did he stall for time; in fact, he recognized that the K-9 in Huber Heights would take too long, thereby unreasonably extending the detention. Significantly, the evidence adduced at the suppression hearings establish that Officer Lane was working on the citation for essentially the entire duration of the stop and did not unreasonably extend the duration of the stop by requesting that a K-9 unit be dispatched. *See Matheny*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, at ¶ 32. Rather, the record establishes that Officer Lane did not unreasonably extend Hall's detention beyond what was reasonably necessary to resolve the issues associated with the traffic stop and to issue a traffic citation. The 19-minute time period between when Officer Lane began writing the citation and when the K-9 unit alerted on Hall's vehicle was therefore reasonable under the facts presented in the instant case.

**{¶ 31}** Hall's first, third, fourth, fifth, and sixth assignments of error are overruled.

**{¶ 32}** Hall's seventh assignment of error is as follows:

THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE SEIZED INCIDENT TO, AND SUBSEQUENT TO, HIS ARREST.

**Statements Made by Hall Prior To and After His Arrest**

**{¶ 33}** In his seventh assignment, Hall argues that the trial court erred by failing to suppress all statements that he made to police before and after being arrested. We note that the trial court ruled in its initial suppression decision issued on August 17, 2016, that any statements made by Hall while he sat in the police cruiser prior to being *Mirandized* would be suppressed. However, as previously stated, the trial court refused to suppress the spontaneous statements made by Hall after he was arrested but prior to being placed

in the back of the cruiser. The trial court also found that statements made to police by Hall after he was *Mirandized* were not subject to suppression.

**{¶ 34}** "Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed." *State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 12 (2d Dist.). "[T]he State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given." *Id.* at ¶ 16.

**{¶ 35}** "Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues." *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 30. Generally, statements made to police after a knowing, intelligent, and voluntary waiver of an individual's *Miranda* rights are presumed voluntary. *Id.* at ¶ 31. However, "[t]he *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.). Therefore, "[r]egardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion." *State v. Kelly*, 2d Dist. Greene

No. 2004-CA-20, 2005-Ohio-305, ¶ 11.

{¶ 36} When making a determination regarding whether a valid waiver has occurred, we must "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, overruled on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

### Spontaneous Statements Made by Hall

{¶ 37} As previously stated, the trial court found that, as Hall was being placed in the cruiser, he spontaneously made the following statements, to wit: 1) "Lord, Lord, Lord, I done f*** up"; 2) "All my sh***, f***"; and 3) "I really f*** up." Hall's statements were recorded by audio equipment inside the cruiser. A suspect who volunteers information, and who is not even asked any questions, is not subject to a custodial interrogation and is not entitled to *Miranda* warnings. *State v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997), citing *State v. Roe*, 41 Ohio St.3d 18, 22, 535 N.E.2d 1351 (1989). In other words, "*Miranda* does not affect the admissibility of '[v]olunteered statements of any kind.' " *Id.*, citing *Miranda*, 384 U.S. at 478; *State v. Montgomery*, 2d Dist. Montgomery No. 23870, 2010–Ohio–5047, ¶ 15.

{¶ 38} Upon review, we conclude that the trial court did not err in denying Hall's motion to suppress the volunteered statements that he made to Officer Lane after being arrested and prior to being placed in the cruiser. The record establishes that the statements were not elicited in response to any questions from Officer Lane; they were

made spontaneously. *See Montgomery* at ¶ 15.

**Statements Made by Hall After Being Mirandized**

**{¶ 39}** Here, Hall argues that the record establishes that he did not validly waive his *Miranda* rights. Initially, we note that Officer Lane testified that he read Hall his *Miranda* rights directly from a printed card. Officer Lane further testified that Hall indicated that he understood each right. Officer Lane then proceed to ask Hall questions about the contraband found in the vehicle, which Hall freely answered. No evidence was adduced that Hall was subjected to intimidation, deception, or coercion. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 177, quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).

**{¶ 40}** Detective Fritz testified that he provided Hall with his *Miranda* warnings. Hall signed the pre-interview waiver of rights form and agreed to speak with Detective Fritz. Detective Fritz testified that he questioned Hall for approximately thirty minutes, during which Hall made several admissions. At no point during the interview did Hall request an attorney, and there is no evidence that Hall was subjected to intimidation, deception, or coercion while being questioned by Detective Fritz. Accordingly, the trial court did not err when it overruled Hall's motion to suppress the spontaneous statements he made after he was arrested but prior to being placed in the back of the cruiser, as well as the admissions he made to police after being properly *Mirandized*.

**{¶ 41}** In light of the foregoing, Hall's seventh assignment of error is overruled.

**{¶ 42}** Hall's second assignment of error is as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION(S) TO DISMISS (DELAY IN PROSECUTION, MISTAKEN INDICTMENT, AND *GONZALES* CASE RECONSIDERATION).

**{¶ 43}** In his second assignment, Hall argues that the trial court erred when it failed to grant his motion to dismiss on the basis of preindictment delay.

**{¶ 44}** Delay between a defendant's involvement in alleged criminal conduct and an indictment involving such conduct may deprive a defendant of his constitutionally protected due process rights. *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. In *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, the Ohio Supreme Court recently reiterated that "* * * preindictment delay violates due process only when it is unjustifiable and causes actual prejudice." *Id.* at ¶ 12. The court also reaffirmed its firmly established "burden-shifting framework for analyzing a due-process claim based on preindictment delay [which states that] [o]nce a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.* at ¶ 13, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998); *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 99.

**{¶ 45}** A reviewing court must scrutinize a defendant's claim of prejudice by "consider[ing] the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Jones* at ¶ 20. "* * * [S]peculative prejudice does not satisfy the defendant's burden." *Id.* "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the

defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Id.* at ¶ 28.

**{¶ 46}** In the instant case, Hall argues that he has suffered "substantial prejudice to his defense" as a result of the "considerable delays in time that chronologically took place" in the prosecution of his case. Hall argues that he has suffered prejudice in the form of loss of employment, loss of income as a result of having to fund his defense, and "considerable uncertainty to the probability of the benefit and/or detriment of any issue related legal maneuvers." At the hearing on the motion to dismiss, when Hall's counsel was asked to articulate some evidence of "actual prejudice" suffered by his client, he merely stated that the proceedings had put Hall's life on "standstill."

**{¶ 47}** Upon review, we conclude that Hall has failed to establish any "actual prejudice" resulting from the six-month delay between his arrest and subsequent indictment. Hall has failed to adduce any evidence to support a claim of actual prejudice such as the death of a key witness, lost evidence, or faded memories which resulted from the State's delay in indicting him. *See State v. Collins*, 118 Ohio App.3d 73, 691 N.E.2d 1109 (2d Dist.1997). Rather, the examples of prejudice advanced by Hall (loss of employment, loss of income, general uncertainty) simply do not constitute the type of prejudice envisioned by the Ohio Supreme Court. Thus, Hall has failed to prove that the delay in commencing prosecution in this case resulted in any actual prejudice to him and violated his right to due process of law thereby.

**{¶ 48}** Finally, we note that although Hall mentioned "mistaken indictment" and "*Gonzales* case reconsideration" in his assignment of error, he failed to provide any support for those arguments in the body of his appellate brief. Therefore, we will not

speculate as to what Hall's arguments may have been regarding those issues.

{¶ 49} Hall's second assignment of error is overruled.

{¶ 50} Hall's eighth assignment of error is as follows:

THE TRIAL ERRED BY DENYING APPELLANT'S MOTION THAT THE

SUBJECT MANDATORY FINE WOULD NOT BE APPROPRIATE UNDER

THE CIRCUMSTANCES.

{¶ 51} In his final assignment, Hall argues that the trial court erred when it imposed a mandatory fine of $10,000.00 as part of his sentence for Count II, possession of cocaine. We note that on June 21, 2017, Hall filed a "Financial Disclosure/Affidavit of Indigency" form. The affidavit stated that Hall was currently employed with a monthly gross income of $900.00 and monthly expenses totaling $723.62. Hall did not object to the imposition of the mandatory fine at the time of sentencing, nor did he file a motion to waive the fine with the trial court.

{¶ 52} R.C. 2929.18(B)(1) provides:

For a first, second, or third degree felony violation of any provision of

Chapter 2925, 3719, or 4729 of the Revised Code, the sentencing court

shall impose upon the offender a mandatory fine * * *. If an offender

alleges in an affidavit filed with the court prior to sentencing that the offender

is indigent and unable to pay the mandatory fine and if the court determines

the offender is an indigent person and is unable to pay the mandatory fine

described in this division, the court shall not impose the mandatory fine

upon the offender.

{¶ 53} "For purposes of the statute, being 'indigent' and being 'unable to pay' are

not the same. Indigency concerns a defendant's current financial situation, whereas an inability to pay encompasses his future financial situation as well." *State v. Plemons*, 2d Dist. Montgomery Nos. 26434, 26435, 26436 & 26437, 2015–Ohio–2879, ¶ 7. The defendant bears the burden of proving that he or she is indigent and unable to pay the mandatory fine. *Id.* at ¶ 8.

{¶ 54} "[A] hearing is not required on a defendant's ability to pay a mandatory fine, and a trial court need not make specific findings on the issue. A trial court need only consider the issue, which it frequently can do by reviewing a pre-sentence investigation report that contains enough pertinent information." (Citation omitted). *Id.* We review the trial court's decision for an abuse of discretion. *Id.*

{¶ 55} In *Plemons*, we emphasized that the fine was mandatory unless the defendant alleged in a presentence affidavit that he was indigent and was unable to pay the mandatory fine. *Id.* at ¶ 9. As with Hall in the instant case, Plemons had completed a financial disclosure/affidavit of indigency form utilized for determining whether the defendant was entitled to appointment of counsel. The form did not mention Plemons's ability to pay the mandatory fine. We found the affidavit in *Plemons* to be insufficient, stating the following:

> Merely alleging indigency and an inability to afford private counsel does not establish an inability to pay a fine. Indeed, "[a] finding of indigence for purposes of appointed counsel does not shield the defendant from paying a fine." " 'This is because the ability to pay a fine over a period of time is not equivalent to the ability to pay legal counsel a retainer fee at the onset of criminal proceedings.' " Plemons' failure to file a pre-sentence affidavit

alleging that he is indigent and is unable to pay the mandatory fine is, alone, a sufficient reason to affirm the trial court's decision. Absent such an affidavit, R.C. 2929.18(B)(1) made the fine mandatory.

**{¶ 56}** Hall's presentence affidavit filed shortly before he was sentenced addressed his current indigence, but failed to indicate that he was unable to pay the mandatory fine. Based on this deficiency alone, we could affirm the trial court's imposition of a fine. *Id.*; *see also State v. Donley*, 2d Dist. Montgomery Nos. 26654, 26655, 26656, 2017–Ohio–562.

**{¶ 57}** Additionally, at Hall's sentencing hearing, the trial court made the following findings:

Trial Court: Likewise, the Court on all charges, except the F-1, will impose no fine in this matter.

The Court is very aware of the *Plemons* case, finds it directive in this case as far as mandatory statutory fines are concerned.

Mr. Hall, from the very beginning, you and I have had conversations about you working because and you being in my court so much you know how much working means to this Court.

Hall: Yes, sir.

Trial Court: And you've maintained that ever since you've been in and we've gone to lengths to make sure that you can work. *So, to me, you have demonstrated that you do have the future ability to pay a fine and that's probably why you've elected to go forward today is because you know that you do. And there's no sense in putting up anything against that. And I*

*respect that.*

So the Court will order – the fine is anywhere from $10,000.00 to $20,000.00 mandatory fine. I'll do the minimum at $10,000.00.

(Emphasis added.) Tr. 231.

**{¶ 58}** Upon review, we see no abuse of discretion in the trial court's imposition of the fine. At the time of his PSI, Hall was thirty-four years old, and we find that the trial court acted within its discretion in reasoning, based in part on Hall's good physical and mental health, that he could obtain employment and make payments toward his fine upon his release from prison at age thirty-eight. Hall reported that he graduated from West Carrolton High School on May 29, 2003. Hall also reported that he obtained a certification in construction craft in 2007, and another certification as a home health aide in 2012. At the time that he was sentenced, Hall was employed at Volunteers of America in Dayton, Ohio, since March of 2017. Prior to that, Hall reported that he was employed at Choice in Community Living, Blue Green Home Health, Home Health Quality, and Walmart.

**{¶ 59}** "Obviously, neither this court nor the trial court can predict the future." *Plemons* at ¶ 10. On the record before us, however, we cannot say the trial court abused its discretion in declining to find that Hall, an able-bodied, relatively young man who was employed when he was arrested and charged in the instant case, would be unable to pay his mandatory fine in the future.

**{¶ 60}** Hall's eighth assignment of error is overruled.

**{¶ 61}** Hall's ninth and final assignment of error is as follows:

THE TRIAL COURT ERRED BY FAILING TO DETERMINE

WHETHER OR NOT THERE WAS APPROPRIATE VENUE AND/OR JURISDICTION FOR THE SUBJECT STOP INVESTIGATION AND ARREST OF APPELLANT, BY VIRTUE OF OFFICER LANE'S STATUS AS OFF-SITE FIVE RIVERS METRO PARK RANGER.

**{¶ 62}** Initially, we note that Hall argues in his ninth assignment that "the trial court erred by failing to determine whether or not there was appropriate venue and/or jurisdiction for the subject stop *** by virtue of Officer Lane's status as [an] off-site Five Rivers Metro Park Ranger."   At the close of the second motion to suppress hearing, the following exchange occurred between the trial court and the parties:

Trial Court: *** I can also tell you, [defense counsel], that based on what I saw in the – on the video I believe it's a good stop.   Make your argument if you want to, but the video, at least from what I could see, showed the Defendant's vehicle not stopping.   I could see the headlights coming and going right – making a right-hand turn at that intersection that was testified that there was a stop sign.   So I think it's a good stop.

The Court is aware of the jurisdictional requirements for park rangers and property adjacent to, as I understand, Princeton and Westland, which I do know very well, having attended Colonel White High School in that jurisdiction.   So that's – anything that I'm saying now, so that if I'm saying something and you're sitting there thinking I'm dead wrong, either of you, which Lord knows my better half straightens me out on that every day of my life, so I'm used to that.   And I don't hold any airs about it or cares about it. Please feel free to, but I'm at least giving you the heads up as to what I am

seeing as the issues so that respond accordingly.

{¶ 63} As previously stated, on August 17, 2016, the trial court issued a decision sustaining in part and denying in part Hall's separate motions to suppress statements and evidence obtained during the search respectively, which were both filed on June 21, 2016. Thereafter, Hall filed additional supplemental motions to suppress on November 3 and 30, 2016, arguing that the evidence seized from his vehicle was only discovered after an unreasonably prolonged detention because of the time it took for the K-9 unit to arrive at the scene. Significantly, Hall did not raise in any of his written suppression motions a challenge to the propriety of the initial stop based upon any jurisdictional defect stemming from Officer Lane's status as a ranger for the Five Rivers MetroParks.

{¶ 64} Even if Hall did not waive his argument regarding the jurisdiction of the park ranger to initiate a stop, his assignment still fails. Pursuant to R.C. 1545.13(B), park district law enforcement officers are authorized to "exercise all the powers of a police officer within and adjacent to the lands under the jurisdiction and control of the board" of park commissioners. *State v. Tooson*, 2d Dist. Montgomery No. 23290, 2009-Ohio-6269, ¶ 11. Here, Officer Lane testified that he observed Hall run a stop sign located at the intersection of Wesleyan Road and Princeton Drive, an area which is adjacent to park grounds. Pursuant to R.C. 1545.13(B), Officer Lane has jurisdiction over criminal offenses committed on park grounds and on property adjacent to park grounds. In order to avoid traffic congestion, Officer Lane testified that he did not initiate a traffic stop of Hall until they reached the intersection of Cornell Drive and Otterbein Avenue, an area not "within and adjacent to" park land. Pursuant to R.C. 2935.03(D)(2), a law enforcement officer can conduct an "extraterritorial" stop of a suspect who has committed an offense

if the pursuit of the suspect began within the officer's territorial jurisdiction. In fact, the trial court had previously found a stop sign violation had occurred thereby generating a traffic stop. Further, the trial court noted the vehicle "not stopping" in the video. Accordingly, Officer Lane had jurisdiction to initiate a traffic stop of Hall after observing him fail to stop at a stop sign located at an area which is adjacent to park grounds.

{¶ 65} Hall's ninth and final assignment of error is overruled.

{¶ 66} All of Hall's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Michael Scarpelli
Carlo McGinnis
Hon. Richard Skelton