[Cite as *State v. Pack*, 2019-Ohio-14.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27890 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2229 |
| | : | |
| WARREN PACK | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of January, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

CHRISTOPHER A. DEAL, Atty. Reg. No. 0078510, 2541 Shiloh Springs Road, Dayton, Ohio 45426
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the court on the February 6, 2018 Notice of Appeal of Warren Pack. Pack appeals from his January 29, 2018 Judgment Entry of Conviction, following a no contest plea, on one count of aggravated possession of drugs (methamphetamine) (bulk but < 5 times bulk), in violation of R.C. 2925.11(A), a felony of the third degree. We hereby affirm the judgment of the trial court.

{¶ 2} Pack was indicted on August 11, 2017. Pack filed a Motion to Suppress on September 26, 2017, and a hearing was held on November 9, 2017. At the hearing, Officer Harry Dilley of the Dayton Police Department testified that, on July 14, 2017, he was working as a patrol officer from 5:00 p.m. to 3:00 a.m. Officer Dilley testified that at approximately 2:00 a.m., while traveling in a marked cruiser, he initiated a traffic stop of a white U-Haul van driven by Pack in the area of Third Street and Hedges Street, after observing it run a red light at Irwin Street and Third Street. Pack's wife, Hillary Pack, was in the passenger seat of the van, and there was dog in the back of the van.

{¶ 3} Video recorded by Dilley's cruiser camera was played for the court. Officer Dilley testified that when he approached the vehicle, he smelled a strong odor of alcohol, and he therefore asked Pack to exit the van and placed him in his cruiser. Officer Dilley stated that he obtained the Packs' identification from Pack's wife and then returned to the cruiser. Officer Dilley testified that he performed a horizontal gaze nystagmus test on Pack. Officer Dilley also "ran [the Packs] through my in-car computer" and learned that "Mrs. Pack was recently arrested for drug possession, so I asked Mr. Pack if it was okay if I searched the car for any drugs." Officer Dilley testified that Pack "said all the stuff in the car wasn't his, so he'd say no."

**{¶ 4}** Officer Dilley testified that he then requested a K-9 officer to respond to the scene. Officer Dilley testified that Pack asked him to check on his wife in the van, and that he "said that she wasn't feeling well." Officer Dilley stated that when he returned to the van, Pack's wife "said she had to go to the bathroom really bad" and asked if she could walk to the Clark gas station two blocks away. According to Officer Dilley, Pack "really multiple times asked to get out of the cruiser and go back" to the van. Officer Dilley stated that he became suspicious because Pack "didn't want me to get in the vehicle. It just seemed like he really wanted to get to the vehicle. He was very persistent about getting back to the vehicle."

**{¶ 5}** Officer Dilley testified that the canine unit arrived while he was still processing the red light ticket. Officer Dilley stated that he was filling out the citation when the canine unit arrived. Officer Dilley stated that the cruiser video started recording at 2:02 a.m., and that the canine unit arrived at 2:19:50. Officer Dilley testified that "even under normal circumstances," he "would need more time than 17 minutes to write the citation."

**{¶ 6}** Officer Dilley stated that the canine officer recommended that the Packs' dog be removed from the van before a sniff was conducted; Officer Dilley asked Mrs. Pack to remove the dog, but she declined to do so, stating that she did not have a leash. Officer Dilley testified that he retrieved a leash from his cruiser for Mrs. Pack to use, but she still refused to remove the dog from the back of the van. Officer Dilley further testified that, while speaking to Mrs. Pack about her dog, he shined a flashlight into the rear window of the van and was able to observe a black case with several glass pipes in plain view. Officer Dilley testified that based upon his experience, glass pipes like the ones he observed in the van are used to smoke illegal drugs such as crack or methamphetamine.

**{¶ 7}** Officer Dilley testified that, at this point, Mrs. Pack became "lightly argumentative," and the officers decided to detain her in the back seat of a police cruiser. The officers were unable to remove the Packs' dog from the rear of the van. Nevertheless, at approximately 2:30 a.m., Officer Robert Cleaver proceeded to conduct the free-air sniff with his canine partner while the other dog remained in the van. Shortly thereafter, the canine unit alerted to the presence of illegal drugs near the passenger side doors of the van. The officers then performed a search of the interior of the van where they located methamphetamine and other drug paraphernalia.

**{¶ 8}** After finding the contraband, Officer Dilley returned to his cruiser where Pack was being detained and informed him of his *Miranda* rights. Officer Dilley then interviewed Pack, who subsequently made admissions regarding the presence of the contraband in the van. The record establishes that at no time did Pack invoke his right to remain silent or his right to counsel. At the conclusion of the interview, Officer Dilley arrested Pack for drug possession and transported him to the Montgomery County Jail.

**{¶ 9}** On August 11, 2017, Pack was indicted for one count of aggravated possession of drugs (bulk amount but less than five times the bulk amount), in violation of R.C. 2925.11(A) and 2925.11(C)(1)(b), a felony of the third degree. On September 26, 2017, Pack filed a motion to suppress, as discussed above, arguing that Officer Dilley unlawfully extended the duration of the original traffic stop in order to request a canine unit to the scene to perform a free-air sniff around Pack's van. A hearing was held on Pack's motion, after which the trial court overruled Pack's motion to suppress.[1]

---

[1] The trial court overruled the motion to suppress from the bench at the hearing on November 9, 2017. The trial court's entry overruling Pack's motion was journalized on November 20, 2017.

{¶ 10} On November 14, 2017, Pack entered a plea of no contest to one count of aggravated possession of drugs. The trial court found Pack guilty and, on January 23, 2017, it sentenced him to community control sanctions and ordered him to complete the MonDay program.

{¶ 11} It is from this judgment that Pack now appeals.

{¶ 12} Pack's sole assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION

TO SUPPRESS.

{¶ 13} In his sole assignment, Pack contends that the trial court should have granted his motion to suppress any physical evidence and/or statements because the traffic stop was unreasonably extended for the sole purpose of a canine sniff.

{¶ 14} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *State v. Gordon*, 5th Dist. Fairfield No. 14-CA-13, 2014-Ohio-5027, ¶ 14, citing *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

**{¶ 15}** "When an officer detains a motorist for a traffic violation, the stop should delay the motorist only for the amount of time necessary to issue a citation or warning." *State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 9, citing *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12. "The reasonable stop time includes the amount of time it takes to conduct a computer check on the driver's license, registration, and vehicle plates." *Id.* " 'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.*, quoting *Batchili*.

**{¶ 16}** Nevertheless, official "conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), quoting *United States v. Jacobsen*, 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court held that the use of "a well-trained narcotics-detection dog" to examine unopened personal luggage "did not constitute a 'search' within the meaning of the Fourth Amendment" because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search," and because such an examination "discloses only the presence or absence of narcotics, a contraband item." *See also Jacobsen* at 121-123 (finding no legitimate privacy interest in the possession of contraband). Relying on its holding in *Place*, the Court found in *Caballes* that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." *Caballes* at 408.

## Length of Detention

{¶ 17} As previously stated, Pack's argument on appeal regarding the trial court's denial of his motion to suppress is that the traffic stop had been unreasonably prolonged by the time the canine unit performed a free-air sniff and alerted to the presence of drugs inside his vehicle.

{¶ 18} In *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), a canine officer stopped Rodriguez for driving on the highway shoulder, a violation of Nebraska law. After checking Rodriguez's and his passenger's identification and issuing a warning to Rodriguez, the officer asked Rodriguez for permission to walk a canine around the vehicle. When Rodriguez refused, the officer detained him until a second officer arrived, and then the officer walked a canine around the vehicle. The dog alerted to the presence of drugs in the vehicle. Seven or eight minutes elapsed between the issuance of the warning and when the dog alerted.

{¶ 19} The U.S. Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez* at 1612, citing *Caballes*, 543 U.S. at 407, 125 S.Ct. 834, 160 L.Ed.2d 842.

{¶ 20} Recently, in *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276 (2d Dist.), we addressed whether the trial court had erred in suppressing drug-related evidence found through a canine sniff during a traffic stop. In *Hall*, the officer requested a canine unit while in the process of confirming Hall's identity. After confirming Hall's identity, the

officer "did nothing to process the traffic stop for approximately eight minutes," even though he had all of the information that he needed to complete a citation. After the dog arrived, it alerted to the presence of drug-related contraband. The trial court suppressed the evidence. On appeal, the State argued that the sniff had occurred within the amount of time (12-13 minutes) deemed reasonable for a traffic stop. The State thus claimed that the drug sniff did not unlawfully extend the stop. We rejected this argument and affirmed the trial court's suppression ruling.

{¶ 21} In rejecting the State's argument in *Hall*, we stated that the U.S. Supreme Court "made clear in *Rodriguez* that an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *Hall* at ¶ 13, quoting *Rodriguez* at 1616. We explained:

Notably, the *Rodriguez* majority explicitly rejected the government's argument that an officer may "incrementally" prolong a stop to perform a drug sniff provided he "is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances." [*Rodriguez*] at 1616. The Court emphasized that reasonableness "depends on what the police in fact do," and diligence is measured "by noting what the officer actually did and how he did it." *Id*. The "critical question" in each case is "whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.' " *Id*.

*Hall* at ¶ 10.

**{¶ 22}** In *State v. Matheney*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, we held that a canine sniff did not unreasonably extend the time for a traffic stop where the dog alerted 24 to 26 minutes after the stop. Although the officer involved testified that it normally took him 12 to 15 minutes to issue citations, the defendant's actions prolonged the stop by forcing the officer to conduct a pat down for his safety. *Id.* at ¶ 30. In finding the duration of the stop permissible, we reasoned:

> * * * [I]n the time before the canine sniff was conducted, Officer Sanford remained busy preparing Matheney's traffic citation, which he had not yet completed when the canine unit arrived. Moreover, under the specific facts of this case, we do not find that 24 to 26 minutes is an unusual length of time for the traffic stop in question given that Matheney engaged in conduct warranting a pat-down search.
>
> Because Sanford was not simply waiting for the canine unit to arrive, but rather running Matheney's information through his computer, patting Matheney down for weapons after his abrupt movement toward the back seat of the vehicle, and preparing Matheney's traffic citations, we find that under the circumstances, Sanford diligently conducted the investigation within a reasonable length of time. Accordingly, under the totality of the circumstances, we do not find that Matheney's detention was extended beyond what was reasonably necessary to resolve the issues associated with the traffic stop and to issue a traffic citation.

*Id.* at ¶ 30-31.

**{¶ 23}** Most recently, this Court revisited the issue in *State v. Hall*, __ N.E.3d __,

2018-Ohio-2321 (no relation to the 2017 case), wherein we stated the following:

    * * * Officer Lane initiated the stop of Hall's vehicle at approximately 7:20 p.m. Officer Lane approached Hall's vehicle approximately one minute later and asked him for information. Officer Lane then returned to his cruiser, began entering Hall's information into his computer, and requested that a K-9 unit be dispatched to the scene to perform a free-air sniff around Hall's vehicle. The dispatcher indicated that the K-9 unit was currently in Huber Heights. Officer Lane testified that he informed dispatch that it would take too much time for the K-9 unit to arrive. The dispatcher responded that he had located another K-9 unit in west Dayton in Officer Lane's immediate vicinity. Officer Lane's exchange with the dispatcher lasted from 7:22 to 7:24 p.m. Officer Lane requested that the K-9 unit respond to his location. Officer Lane testified that he requested the K-9 unit because Hall was acting overly nervous upon being stopped. Specifically, Officer Lane observed that Hall slammed the glove box after removing his proof of insurance card, as if he did not want Officer Lane to see what was inside.

    After successfully requesting the K-9 unit, Officer Lane entered Hall's information into the LEADS database and the Dayton Police Department's "MIS" system. Officer Lane testified that entering Hall's information took approximately three to four minutes. Thereafter, Officer Lane testified that he began writing Hall's citation for the stop sign violation. The trial court found that Officer Lane began writing the citation at approximately 7:25 p.m.

As previously stated, Five Rivers MetroParks does not provide its rangers with citations that contain template or "pre-loaded" information, thereby requiring Officer Lane to fill out all of the information in Hall's citation by hand. Furthermore, because he patrolled multiple jurisdictions, Officer Lane testified that he had to verify that Hall's citation referenced the correct court. Accordingly, Officer Lane testified that it generally takes him longer to complete a traffic citation than it does for an officer from a municipal department.

At approximately 7:42 p.m., Officer Cleaver arrived with his K-9 unit, Phantom. When Officer Cleaver arrived, Officer Lane testified that he was still completing Hall's citation. Officer Lane testified that he stopped working on the traffic citation at approximately 7:43 and removed Hall from his vehicle so that Officer Cleaver could perform a free-air sniff with Phantom. At approximately 7:44 p.m., Phantom alerted to the presence of narcotics in Hall's vehicle. The trial court found that only 19 minutes had passed between the time Officer Lane began writing Hall's citation and when Phantom began the free-air sniff.

Unlike the police officer in *Hall*, 2017-Ohio-2682, 90 N.E.3d 276, who "did nothing to process the traffic stop for approximately eight minutes" while he waited for a K-9 unit to arrive, Officer Lane acted reasonably and diligently by confirming Hall's identification and working on his citation before, during, and after the K-9 unit began its sniff around the vehicle. Officer Lane was not simply waiting for the K-9 unit to arrive nor did he stall

for time; in fact, he recognized that the K-9 in Huber Heights would take too long, thereby unreasonably extending the detention. *Significantly, the evidence adduced at the suppression hearings establish that Officer Lane was working on the citation for essentially the entire duration of the stop and did not unreasonably extend the duration of the stop by requesting that a K-9 unit be dispatched. See Matheney*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, at ¶ 32. *Rather, the record establishes that Officer Lane did not unreasonably extend Hall's detention beyond what was reasonably necessary to resolve the issues associated with the traffic stop and to issue a traffic citation. The 19-minute time period between when Officer Lane began writing the citation and when the K-9 unit alerted on Hall's vehicle was therefore reasonable under the facts presented in the instant case.*

(Emphasis added.) *Id.* at ¶ 27-30.

**{¶ 24}** In the instant case, the record establishes that Officer Dilley testified that at around 2:00 a.m., while traveling in a marked cruiser, he initiated a traffic stop of a white U-Haul van driven by Pack in the area of Third Street and Hedges Street, after observing it run a red light. After being stopped, Pack informed Officer Dilley that his wife was in the passenger seat of the van and that there was dog in the back of the van.

**{¶ 25}** Officer Dilley testified that upon approaching the vehicle, he smelled a strong odor of alcohol, and therefore asked Pack to exit the van and placed him in his cruiser. Officer Dilley obtained the Packs' identification from Pack's wife and then returned to the cruiser. Officer Dilley also performed an HGN test on Pack. Officer Dilley testified that he ran the Packs through the computer in his cruiser and learned that

Mrs. Pack was recently arrested for drug possession. Officer Dilley testified that he then asked Pack for permission to search the van for contraband, but Pack refused to give consent.

{¶ 26} At that point, Officer Dilley decided to request a canine unit to perform a free-air sniff of the van. Officer Dilley testified that Pack asked him to check on his wife in the van because she was not feeling well. At approximately 2:12 a.m., Officer Dilley exited the cruiser and went to check on Mrs. Pack. After checking on Mrs. Pack, Officer Dilley returned to the cruiser to finish processing Pack's traffic ticket at approximately 2:14 a.m.

{¶ 27} Officer Dilley testified that the canine unit arrived at 2:19:50. Officer Dilley testified that "even under normal circumstances," he "would need more time than 17 minutes to write the citation." When the canine unit arrived, Officer Dilley testified that he stopped processing Pack's traffic citation, exited his cruiser, walked over to the van with Officer Cleaver, and asked Mrs. Pack to step out the vehicle and remove the dog from the back of the van. Mrs. Pack stated that she had no leash and could not remove the dog. Officer Dilley retrieved a leash from his cruiser, but Mrs. Pack still refused to remove the dog. At approximately 2:22 a.m., while speaking to Mrs. Pack, Officer Dilley shined a flashlight into the rear window of the van and was able to observe a black case with several glass pipes in plain view. At that point, Officer Dilley decided to detain Pack. Officers Dilley and Cleaver then attempted to remove the dog from the back of the van but were unsuccessful. Without removing the dog, Officer Cleaver performed a free-air sniff around the van which resulted in the discovery of methamphetamine and drug paraphernalia at approximately 2:30 a.m.

**{¶ 28}** Approximately 17 minutes elapsed between when Officer Dilley initiated the traffic stop and when the canine unit arrived. During that time, Officer Dilley was not merely waiting for the canine unit to arrive, nor was he stalling for time. Rather, the record establishes that in the interim between the beginning of the stop and the arrival of the canine unit, Officer Dilley removed Pack from the van because he smelled alcohol, began preparing Pack's traffic citation, checked on the welfare of Mrs. Pack, and then went back to the cruiser in order to finish the citation. When the canine unit arrived at 2:19 a.m., Officer Dilley had to contend with an "argumentative" Mrs. Pack as well as the dog in the back of the van before the free-air sniff could commence. Additionally, Officer Dilly observed drug paraphernalia inside the van while speaking with Mrs. Pack. Based upon the delay occasioned by Mrs. Pack's uncooperativeness, the free-air sniff did not commence until approximately 2:30 a.m. Under the totality of the circumstances, we do not find that Pack's detention was extended beyond what was reasonably necessary to resolve the issues associated with the traffic stop and to issue a traffic citation. The 30-minute time period between when Officer Dilley began writing the citation and when the canine unit alerted on Pack's vehicle was therefore reasonable under the facts presented in the instant case. Accordingly, the trial court did not err when it overruled Pack's motion to suppress.

**{¶ 29}** Pack's assignment of error is overruled.

**{¶ 30}** Pack's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Christopher A. Deal
Hon. Erik R. Blaine