[Cite as *State v. Manns*, 2024-Ohio-23.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29882 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 00557 |
| | : | |
| JAMES MANNS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 5, 2024

. . . . . . . . . . .

MICHAEL O. MILLS, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} James Manns appeals from a judgment entry of conviction on one count of aggravated possession of drugs. Manns had entered a no contest plea after the trial court denied his motion to suppress. For the following reasons, we conclude that the trial court did not err in overruling Manns's motion to suppress, and the judgment of the trial court

is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶ 2} This matter arose from a traffic stop in the early morning hours of a vehicle in which Manns was a passenger, after the driver ran a red light and turned onto an interstate entrance ramp from a straight lane in an area known for high drug activity. Both occupants of the vehicle had out-of-state licenses, and the officer who made the stop called for a canine unit and backup while he prepared the citation. When Manns exited the vehicle to allow the dog to perform a sniff, drug paraphernalia fell from his lap, and he admitted to officers that he had drugs in the front portion of his underwear.

{¶ 3} Manns was indicted on one count of aggravated possession of drugs. He filed a motion to suppress which challenged the stop of the vehicle in which he had been a passenger and the length of the detention. Following a hearing, the court overruled the motion to suppress, finding that the traffic stop had not been prolonged beyond the time reasonably required to issue a traffic citation and that Manns had been appropriately detained based upon a reasonable, articulable suspicion that he was in possession of drug paraphernalia.

{¶ 4} Manns appeals from his conviction.

## ASSIGNMENT OF ERROR

{¶ 5} Manns's assignment of error challenges the trial court's denial of his motion to suppress. Manns argues that Deputy Blake Creager, who initiated the traffic stop, lacked reasonable suspicion to detain him for the purpose of conducting a canine sniff and to remove him from the vehicle. He asserts that the traffic stop was "improperly

extended to facilitate the drug sniff." According to Manns, Creager "had no reasonable suspicion to remove him from the vehicle to conduct the more invasive search that prevented him from remaining inside the vehicle." The State responds that the stop was not illegally prolonged to conduct the canine sniff because the officer was still completing the citation when the canine unit arrived and that ordering Manns out of the vehicle was permissible without reasonable suspicion of separate criminal activity.

{¶ 6} When addressing a motion to suppress, the trial court assumes the role of the trier of fact and, as such, is in the best position to resolve conflicts in the evidence and determine the credibility of the witnesses and the weight to be given to their testimony. *State v. Retherford,* 93 Ohio App.3d 586, 639 N.E.2d 498 (1994). In reviewing a suppression decision, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *Id.* Accepting those facts as true, we must then independently determine whether the applicable legal standard is satisfied as a matter of law and without deference to the trial court's legal conclusion. *Id.*

{¶ 7} "A traffic stop may be premised upon any violation of the traffic law. However, '[a]n investigative stop must be temporary and must last no longer than is necessary to effectuate the purpose of the stop.' " *State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 9, quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "When an officer detains a motorist for a traffic violation, the stop should delay the motorist only for the amount of time necessary to issue a citation or warning." *Id.,* citing *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12.

"The reasonable stop time includes the amount of time it takes to conduct a computer check on the driver's license, registration, and vehicle plates." *Id.* The court must evaluate the duration of the traffic stop in light of the totality of the circumstances and determine if the officer diligently conducted the investigation and completed the tasks within a reasonable time. *Id.*

{¶ 8} In *Rodriguez v. United States*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), the United States Supreme Court concluded that the Fourth Amendment does not prohibit unrelated investigative activities during a traffic stop, including the use of a canine unit, provided those activities do not prolong the stop. *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 10 (2d Dist.), citing *Rodriguez* at 1615 ("An officer * * * may conduct certain unrelated checks during an otherwise lawful traffic stop. But * * * he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."). Notably, the *Rodriguez* majority explicitly rejected the government's argument that an officer may "incrementally" prolong a stop to perform a drug sniff if he "is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances." *Rodriguez* at 1616. The Court emphasized that reasonableness "depends on what the police in fact do," and diligence is measured "by noting what the officer actually did and how he did it." *Id.* The "critical question" in each case is "whether conducting the sniff 'prolongs' — i.e., adds time to — 'the stop.' " *Id.*

{¶ 9} At the suppression hearing, Deputy Creager of the Montgomery County

Sheriff's Office testified that, in the early morning hours of November 13, 2022, he was working alone in a marked cruiser when he initiated the traffic stop at issue herein. Creager, who had five years of law enforcement experience at the time, was aware that the area of the traffic stop -- in Harrison Township near the I-75 and I-70 interchange and several hotels -- was known for high drug activity. Hollywood Gaming, a casino, was located nearby in the City of Dayton, east of I-75, and Creager routinely encountered people coming from the casino while on road patrol in the area. At the time of the traffic stop, Creager was eastbound on Needmore Road just west of I-75. At 3:29 a.m., he observed a GMC Envoy with Indiana plates illegally run a red light and turn left onto the entrance ramp of I-75 from a straight lane. Creager activated his lights, which also automatically activated the recording system in his cruiser. Creager turned on his body camera and, when he approached the driver's side of the vehicle, he advised the driver, Angela Castleman, of the reason for the stop. Manns was the front passenger seat.

{¶ 10} Creager requested identification from both occupants; Castleman provided an Indiana driver's license and Manns provided a Florida license. Creager asked to search the vehicle based upon the hour of day, the high drug activity known to be common in the area, the vehicle's Indiana plates, and his experience with drugs being brought to Ohio specifically from Indiana. Castleman declined. Castleman told Creager that they were coming from the casino, which made Creager suspicious, because if they had been coming from the casino to I-75, they "should have been going westbound."

{¶ 11} Creager then asked the occupants if there was anything illegal in the vehicle; Manns responded that there was a pellet gun, but this did not concern Creager.

Creager obtained the occupants' Social Security numbers. While Creager walked toward his cruiser, he requested a canine unit be brought to the scene via a radio attached to his person.

{¶ 12} To prepare the traffic citation, Creager was required to check the validity of the out-of-state licenses and to determine if there were any suspensions, the year, make and model of vehicle, and the occupants' addresses and phone numbers. In his cruiser, Creager began the process through a database known as LEADS. He also used his in-car radio to communicate with a "records channel" because the licenses were from out of state.

{¶ 13} Because he had not obtained the phone numbers of Castleman and Manns, Creager again approached the vehicle to do so. He stated that phone numbers were not officially required, but it was department policy to obtain them. He then used the computer in his cruiser to enter the information he had obtained to complete the traffic citation. According to Creager, if an operator's license number and Social Security number for an Ohio driver were entered into the system, the software would "auto-populate" the remaining fields to quickly complete the citation, but because the driver had an out-of-state license, he had to manually enter the information into the citation. Creager stated that he had been unable to complete the citation before the canine unit arrived approximately 15 minutes after Creager initiated the stop, but that he was engaged in doing so during that intervening time. On the recording of the encounter, which was admitted at the suppression hearing, Creager can be heard expressing his frustration to a fellow officer shortly before the canine unit arrived that he had to manually enter

Castleman's information because of her out-of-state license.

{¶ 14} Creager testified that he requested assistance (back-up) in processing the stop due to concerns for his safety; Deputy Matthew Templin responded. According to Creager, having another officer at the scene allowed that officer to "keep eyes on the vehicle" while the other officer had his head down completing the citation, in case someone tried to hurt him or drive away. Creager acknowledged that he had made a remark to Templin about his and the canine unit's traffic stop statistics, but he continued to process the ticket while doing so. Creager stated, "I try to be as proactive as I can every night."

{¶ 15} Creager testified that for the canine to perform the "free air sniff" for narcotics, the occupants had to exit the vehicle. Creager removed the driver, Templin removed Manns, and both occupants were placed near Creager's cruiser. Templin advised Creager that, as Manns exited the vehicle, a drug smoking device fell from his lap onto the ground. Templin then placed Manns in handcuffs and asked if he had anything else on him; Manns indicated that he had drugs in the front portion of his underwear. Manns's handcuffs were removed to allow him to retrieve the drugs, which he gave to Creager, and then he was handcuffed again. Creager testified that the canine then alerted the officers to the presence of drugs in the vehicle, and the vehicle was searched.

{¶ 16} On cross-examination, Creager denied requesting a canine because he or the dog "needed stats"; he stated that he did so because he suspected there were drugs in the vehicle. Creager acknowledged that he indicated that he would later reward himself

with a coffee for an arrest, and that he speculated about obtaining a "motherload" from the vehicle. Creager stated that he called the canine unit based upon his suspicions that there were drugs or something illegal in the car.

{¶ 17} Deputy Templin testified that, at the time of the stop, he was aware of the "Bulk Smuggling Task Force" and that the Miller Lane area, which was one exit north of where Manns's stop occurred, was known as a "[b]ig narcotics area." When he arrived at the scene, Templin approached the passenger side of Creager's cruiser and observed Creager typing the citation for the driver. Templin then approached the passenger side of the vehicle where Manns was seated to remove him. When he did so, a glass pipe, commonly used for ingesting narcotics in Templin's training and experience, fell to the ground and shattered; Templin placed Manns in handcuffs because narcotics are typically found with drug paraphernalia. Manns was placed in Templin's cruiser and taken to jail. On cross-examination, Templin acknowledged that he acted as an extra set of eyes and hands on the scene of the stop to remove Manns and allow the canine officer to perform the sniff.

{¶ 18} In overruling the motion to suppress, the court noted that it had viewed the video of the stop and saw and heard Dep. Creager communicating with dispatch and typing on the in-cruiser computer; the court noted that the process took longer than normal because the computer program "did not allow for self-population of the ticket" given the out-of-state license and plates of the driver and vehicle. While defense counsel questioned Creager's need for phone numbers, the court noted Creager's testimony that "phone numbers are typically obtained despite not being required." The court rejected

Manns's suggestion that Creager had delaying the process of preparing the ticket so the canine unit could arrive.

{¶ 19} The court concluded that, regardless of Creager's comments or motivation about canine statistics and whether the stop might result in "finding the 'motherload' " of illicit drugs, the video reflected that the driver of the Envoy had turned left from a non-turning lane against a red light, and this traffic violation gave Creager reasonable suspicion to justify a traffic stop. The court also found that the video demonstrated that Creager had worked diligently on the traffic citation and there was no stalling as in *State v. Hall,* 2017-Ohio-2682, 90 N.E.3d 276 (2d Dist.). It was significant to the court that the canine arrived within 15 minutes of the initial traffic stop, which the court found was a reasonable amount of time to issue a citation to a motorist with an out-of-state operator's license. The court concluded that the length of detention was reasonable, citing *State v Pack*, 2d Dist. Montgomery No. 27890, 2019-Ohio-14.

{¶ 20} Regarding the seizure, the court noted that, after a valid stop, law enforcement officers may have the occupants exit the vehicle. In this case, when exiting the vehicle, a glass pipe fell from Manns's lap to the ground. The court found that Dep. Templin had recognized the item as drug paraphernalia from his training and experience. The court noted the early morning hour, that the Envoy had been in an area that was "close to the thoroughfares and motels where illicit drug trafficking is common," and that the driver's "innocent explanation" of her presence in the area (being at the casino) was "not entirely reasonable." The court concluded that the deputies had had reasonable articulable suspicion to believe that Manns "was engaged in criminal activity, to wit

possession of drug paraphernalia" and could be detained.

{¶ 21} We see no error in the trial court's suppression ruling. This case is distinguishable from *Hall*, in which the officer confirmed Hall's identity and requested a canine unit, but then "did nothing to process the traffic stop for approximately eight minutes," although he had the information he needed to complete the citation. The canine subsequently alerted to the presence of drug-related contraband. The evidence was properly suppressed in that case because the United States Supreme Court made clear in *Rodriguez* "that an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *Hall* at ¶ 13, quoting *Rodriguez,* 575 U.S. 348, 135 S.Ct. at 1616, 191 L.Ed.2d 492.

{¶ 22} In *Pack*, 2d Dist. Montgomery No. 27890, 2019-Ohio-14, which the trial court found to be similar to Manns's case, approximately 17 minutes elapsed between when an officer initiated the traffic stop and when the canine unit arrived; during that time, the officer did not merely wait for the canine unit to arrive or stall for time. *Id*. at ¶ 28. Instead, "in the interim between the beginning of the stop and the arrival of the canine unit, [the officer] removed Pack from the van because he smelled alcohol, began preparing Pack's traffic citation, checked on the welfare of Mrs. Pack, and then went back to the cruiser in order to finish the citation." *Id.* We concluded that, under the totality of the circumstances, the officer in *Pack* had not extended the detention beyond what was reasonably necessary to resolve the issues associated with the stop and to issue a traffic citation. *Id.* We therefore held in *Pack* that the 30-minute period between when the officer

began writing the citation and when the canine unit alerted on Pack's vehicle was reasonable under the facts presented in that case. *Id.*

{¶ 23} In addition to reviewing the testimony herein, we have viewed Creager's dash camera video and the body camera videos of Creager and Templin, which were admitted at the suppression hearing. As Creager testified, at approximately 3:29 a.m., he initiated the stop after observing the traffic violations. In requesting the canine unit, Creager had noted the pre-dawn hour, that the area of the stop was known for illegal drug activity, and the occupants' somewhat implausible explanation that they had been coming from the casino. He also knew from his law enforcement experience that drugs were often transported to the area specifically from Indiana.

{¶ 24} A canine officer from the Huber Heights Police Department arrived at 3:43 a.m. The videos made clear that from the time Creager effectuated the stop until the canine unit arrived approximately 15 minutes later, Creager had been engaged in the preparation of the traffic citation, unlike in *Hall*. The removal of the occupants from the Envoy was permissible and was not required to be supported by reasonable suspicion. We conclude that, under the totality of the circumstances, the stop was reasonable, as in *Pack*. In other words, the answer to the critical question before us -- namely whether conducting the sniff added time to the stop -- is no.

{¶ 25} Manns's assignment of error is overruled.

{¶ 26} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.