[Cite as *State v. Cobb*, 2025-Ohio-1274.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30170 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 02180 |
| | : | |
| DEMAR L. COBB | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 11, 2025

. . . . . . . . . . .

DAVID R. MILES, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Demar L. Cobb appeals from his convictions for murder and having a weapon while under disability. For the reasons set forth below, we affirm.

I.      **Factual and Procedural History**

**{¶ 2}** This case arises from the shooting death of G.R. In the late night hours of July 21 and early morning hours of July 22, 2023, G.R. was lawfully engaged in the repossession of a Chevy Avalanche which he had located at the Lakeview Estates apartment complex in Dayton. G.R., who was working with his son, checked the car's vehicle identification number to verify that it was the correct vehicle. G.R.'s son then entered the vehicle and prepared to drive it away. At that point, a man who was later identified as Cobb approached the vehicle and began yelling at G.R. and his son. G.R.'s son drove the vehicle from the apartment complex while Cobb continued to yell at G.R. Cobb claimed that he had property in the vehicle that he needed to retrieve. G.R. informed him that the vehicle had been repossessed and that Cobb could not obtain his belongings. G.R. then began to walk back to his own vehicle. Cobb pulled out a gun and shot G.R. Despite suffering four gunshot wounds, G.R. was able to get in his car and drive away from Cobb. However, he crashed into a nearby parked vehicle. G.R. later died from his wounds.

**{¶ 3}** At approximately 1:00 a.m., Dayton police officers were dispatched to the apartment complex on a report of a shooting. Upon arriving at the scene, the officers found G.R. in his vehicle "slumped over the center console." G.R.'s girlfriend, C.G., was in the passenger seat cradling G.R.'s head, screaming that he had been shot, and asking for help. C.G. indicated "the neighbor" shot G.R.[1] She provided a description of the shooter and stated that he had fled the scene on foot. C.G. was later transported to the police Safety Building for questioning.

---

[1] C.G. lived in the Lakeview Estates apartment complex at the time of the shooting.

{¶ 4} As the police began their investigation, they learned that the repossessed Chevy was registered to Abraham Dennis and that Dennis was connected to apartment number 2928 at Lakeview Estates. At some point, Dennis was located and transported to the Safety Building for questioning.

{¶ 5} At approximately 6:00 a.m. on July 22, the police made contact with Shantae Allen, who resided at apartment 2928. Allen gave consent to search the apartment; upon questioning, she informed the police that her children and an adult male were in the apartment. The adult male, later identified as Cobb, exited the apartment and was placed in the backseat of Officer Ja'Rome Miller's cruiser.

{¶ 6} Miller asked Cobb for identification and then ran a computer check to verify his identity. While Miller was checking his identity, Cobb made a statement regarding where he had been and with whom at the time of the shooting. Detective Tyler Hofacker joined Cobb in the back of the cruiser and asked him questions about the shooting. After the interview was complete, the police ended the encounter. During this initial encounter, Cobb's cell phone was seized because the phone appeared to have blood on it. However, neither the phone nor the blood turned out to be relevant to G.R.'s death.

{¶ 7} A search of the Chevy Avalanche produced a prescription bottle for generic Suboxone with Cobb's name on the label. Police also recovered two receipts, from Speedway and Cashland, in the vehicle. The murder weapon was not recovered.

{¶ 8} On July 24, 2023, Cobb was arrested, transported to the Safety Building, and interviewed by detectives. Cobb confirmed that he lived at apartment 2928 in the Lakeview Estates apartment complex with Allen and her friend Dennis. Cobb informed

the detectives that he had not been at the apartment complex when the shooting occurred. However, he later claimed he had been asleep in the apartment during the shooting and that he had not heard the gunshots. Cobb admitted that he had driven Dennis's Chevy and had left his prescription Suboxone strips in the vehicle.

{¶ 9} On August 3, 2023, Cobb was indicted on one count of murder (proximate result of felonious assault serious physical harm) in violation of R.C. 2903.02(B); one count of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1); murder (proximate result of felonious assault deadly weapon) in violation of R.C. 2903.02(B); and one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2). Each of these charges carried a three-year firearm specification. Cobb was also indicted on one count of having a weapon while under disability (prior drug conviction) in violation of R.C. 2923.13(A)(3).

{¶ 10} Cobb filed a motion to suppress the statements he made to the police at the scene of the shooting. After a hearing on November 2, 2023, the trial court denied Cobb's motion to suppress.

{¶ 11} The matter proceeded to a jury trial on all counts except having a weapon while under disability, which was tried to the court. Cobb was found guilty of all charges and specifications.

{¶ 12} At sentencing, the trial court merged the convictions for murder and felonious assault, and the State elected to proceed to sentencing on count one (murder). The court imposed a sentence of life with parole eligibility after 15 years. The court also imposed a three-year consecutive sentence for the firearm specification on Count 1 and

a three-year consecutive sentence for the firearm specification on Count 2. The court imposed a 36-month sentence for having a weapon while under disability, which was ordered to be served consecutively to the sentence for murder. Cobb's aggregate sentence was life with parole eligibility after 24 years.

{¶ 13} Cobb appeals.

## II. Sufficiency and Manifest Weight

{¶ 14} Cobb asserts the following for his first and second assignments of error:

APPELLANT'S CONVICTIONS FOR MURDER, HAVING A WEAPON UNDER DISABILITY AND THE FIREARM SPECIFICATIONS ARE BASED UPON INSUFFICIENT EVIDENCE.

APPELLANT'S CONVICTIONS FOR MURDER, HAVING A WEAPON UNDER DISABILITY AND THE FIREARM SPECIFICATIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 15} Cobb contends the State failed to present sufficient evidence to support his convictions for murder, having a weapon under disability, and the two firearm specifications. He also contends the convictions were against the manifest weight of the evidence. In support, he argues that the State did not prove he shot G.R. because no murder weapon was found and no forensic evidence linked him to the murder.

{¶ 16} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the crime's essential elements proven beyond a reasonable doubt. *Id.*

{¶ 17} On the other hand, when an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 18} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). *Accord State v. Winbush*, 2017-Ohio-696, ¶ 58 (2d Dist.). As a result, a determination that a conviction is supported by the weight of the evidence will also be dispositive of sufficiency. *State v. Farra*, 2022-Ohio-1421, ¶ 50 (2d Dist.).

{¶ 19} At trial, the State presented the testimony of G.R.'s girlfriend, C.G.

According to her testimony, C.G. lived with her sister in the Lakeview Apartments. She was at home when G.R. and his son arrived to repossess the Chevy. C.G. was standing outside watching the repossession when Cobb walked up and confronted G.R. C.G. testified that, although she did not know his name, she was acquainted with Cobb because he stayed at the apartment next door to hers. She testified that she began to use her cellphone to video-record the interaction between Cobb and G.R., and she observed Cobb pull a gun from his pants and begin to shoot at G.R.

{¶ 20} C.G. was interviewed by Dayton police detectives at the Safety Building. C.G. testified that, after she was interviewed, she returned home and heard a "ruckus" from Cobb's apartment. She overheard Cobb yell, "[w]here's my gun" and "who told?" She and her sister decided to leave their apartment because they were afraid Cobb would learn that she had spoken to the police. As the women were exiting their apartment, they were confronted by Cobb and his girlfriend, who yelled at C.G. The women then entered a car and left the complex. C.G. testified that she then called the police and informed them that the shooter had returned to the apartment complex.

{¶ 21} The State also presented the testimony of S.S., who resided at the Lakeview complex at the time of the shooting. According to S.S., she was sleeping when she was awakened by the sound of gunfire. She got out of bed, looked out her bedroom window, and observed "somebody getting shot at." She also observed a vehicle driving away while the shooter continued to fire. S.S. testified that she recognized the shooter as a man who lived with Abraham Dennis and a woman in a nearby apartment. She further testified that as Cobb walked back to his apartment, she overheard him say, "I

think I got that punk-ass nigger. . . I think he dead." S.S. testified that she also saw Cobb outside her apartment the day after the shooting. She took a picture of him which she provided to the police.

{¶ 22} The State presented evidence that both C.G. and S.S. had identified Cobb from photographic arrays. The State further presented the video of the incident taken by C.G. Cobb's face was not clear on the video, but the clothing he was wearing could be seen. Cobb wore dark pants, a dark shirt, and black tennis shoes with white soles. Although it could not be seen on the video, C.G. testified that Cobb had been wearing a black and orange ball cap. The clothing in the video and the hat described by C.G. matched the attire worn by Cobb when he was recorded by surveillance equipment outside of Cashland on the day of the shooting. And the Cashland receipt found in the Chevy Avalanche included Cobb's signature. Additionally, clothing found in Shantae Allen's apartment matched the described clothing. Finally, after the jury verdict, the parties stipulated that Cobb had a 2011 felony conviction for trafficking in heroin and a 2013 conviction for possession of heroin.

{¶ 23} "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). The jury, as the trier of fact, "is

free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Grant*, 2020-Ohio-3055, ¶ 50 (2d Dist.), citing *State v. Wright*, 2002-Ohio-4279, ¶ 25 (8th Dist.).

**{¶ 24}** The testimony of C.G. and S.S. presented the jury with evidence sufficient to conclude that Cobb shot and killed G.R., and their testimony was not inherently incredible. Further, we cannot conclude that the jury lost its way in choosing to credit the testimony and evidence presented by the State. Thus, the jury had a reasonable basis for finding Cobb guilty of felonious assault and murder. Additionally, based upon the stipulation regarding Cobb's previous convictions, the trial court had more than a reasonable basis to find that Cobb was guilty of having a weapon while under disability.

**{¶ 25}** Cobb's convictions were not against the manifest weight of the evidence and, as such, they were also supported by sufficient evidence. Accordingly, the first and second assignments of error are overruled.

### III. Jury Selection

**{¶ 26}** Cobb's third assignment of error is as follows:

THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION

TO EXCUSE JUROR NO. 8 THE SOLE AFRICAN AMERICAN JUROR.

**{¶ 27}** Cobb asserts that the State's challenge to exclude a juror was racially motivated and that the trial court erred in overruling his challenge made under the auspices of *Batson v. Kentucky*, 476 U.S. 79 (1986). Specifically, he challenges the State's use of a for-cause challenge to remove Juror Number 8, an African-American

woman.

{¶ 28} We find this argument lacking in merit.  The holding in *Batson* "applies only to prospective jurors removed by peremptory challenge."  *State v. Adams*, 2015-Ohio-3954, ¶ 158, citing *Batson* at 96-98.  *Accord State v. Bonner*, 2024-Ohio-4717, ¶ 16, 21 (6th Dist.); *State v. Ivery*, 2018-Ohio-2177, ¶ 22 (9th Dist.).

{¶ 29} Because the State's request to excuse Juror Number 8 did not involve the use of a peremptory challenge, it did not implicate *Batson*.  The third assignment of error is overruled.

### IV.    Character Evidence

{¶ 30} For his fourth assignment of error, Cobb asserts the following:

THE   TRIAL   COURT   ERRED   IN   ALLOWING   IMPROPER CHARACTER EVIDENCE.

{¶ 31} Cobb claims the trial court allowed the State to introduce impermissible evidence of prior bad acts in violation of Evid.R. 404(B).

{¶ 32} During the testimony of Detective Melissa Schloss, the State presented a video of Cobb's July 24, 2024 interview.  During the interview, Schloss stated that she understood Cobb had some property in the truck that the victim had repossessed.  Cobb answered affirmatively, stating that his "Suboxone strips" were in the truck at the time it was removed from the apartment complex.  He further stated, "I need them bad too." Cobb further claimed that he was "getting straight" after being "on pills."

{¶ 33} Defense counsel did not object to the playing of the video.[2]  However, after the video was played, counsel requested a mistrial, claiming the statements suggested Cobb was a drug addict.  The trial court denied the request.

{¶ 34} Because Cobb did not object at trial, we are limited to plain error review. "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." (Citation omitted.) *State v. Obermiller*, 2016-Ohio-1594, ¶ 62. An error affecting substantial rights "must have affected the outcome of the trial."  (Citations omitted.)  *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The law is well-established that "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 35} As stated above, the evidence presented by the State included two eyewitnesses who observed the shooting and were able to positively identify Cobb as the shooter.  Those witnesses were acquainted with Cobb, who was their neighbor.  Thus, there was more than sufficient evidence of Cobb's guilt.  Further, after overruling the motion for a mistrial, the trial court provided a curative instruction advising the jury not to consider the drug evidence as propensity evidence; this instruction was also included in the court's final jury instructions.  There is a presumption "that the jury has followed the instructions given to it by the trial court."  *State v. Murphy,* 65 Ohio St.3d 554, 584 (1992). Consequently, the limiting instruction prevented any danger that the jury would unfairly

---

[2] There is no claim or evidence in this record that defense counsel was unaware of the contents of the video prior to its presentation at trial.

consider the other acts evidence as proof of Cobb's bad character or that he had acted in conformity therewith.

**{¶ 36}** We cannot conclude on this record that Cobb has demonstrated plain error affecting the outcome of the trial. Accordingly, the fourth assignment of error is overruled.

## V.    Jury Instruction

**{¶ 37}** The fifth assignment of error states as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S REQUEST FOR JURY INSTRUCTIONS ON EYEWITNESS TESTIMONY.

**{¶ 38}** Cobb asserts that the trial court erred by overruling his request for an enhanced eyewitness jury instruction. The trial court, instead, gave the standard eyewitness testimony jury instruction from Ohio Jury Instructions (OJI).

**{¶ 39}** Under Crim.R. 30(A), a trial court has a mandatory duty to provide the jury with all relevant and necessary instructions. *State v. Pettiford*, 2019-Ohio-892, ¶ 26 (2d Dist.). However, the decision on what instructions to give is left to the court's discretion. *Id.* Absent an abuse of that discretion, we will not reverse the decision of the trial court. An abuse of discretion occurs when a trial court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219.

**{¶ 40}** Ohio Jury Instructions, CR § 409.05(5) sets out the following model jury instruction regarding eyewitness testimony:

(A) Some things you may consider in weighing the testimony of an

identifying witness are:

(1) the capacity of the witness, that is, the (describe age of witness) age, (describe level of intelligence of witness) intelligence, (describe defective senses of witness, if any), and the opportunity of the witness to observe;

(2) the witness' degree of attention at the time the witness observed the offender;

(3) the accuracy of the witness' prior description (or identification, if any);

(4) whether the witness had had occasion to observe the defendant in the past;

(5) the interval of time between the event and the identification; and

(6) all surrounding circumstances under which the witness has identified the defendant (including deficiencies, if any, in lineup, photo display, or one-on-one identification).

(B) If, after examining the testimony of the identifying witness you are not convinced beyond a reasonable doubt the defendant is the offender, you must find the defendant not guilty.

**{¶ 41}** At trial, Cobb presented the testimony of Melissa Berry, an attorney with a Ph.D. in psychology. Berry testified regarding the mechanism of memory and eyewitness testimony in conjunction with factors which may affect memory. Based upon Berry's testimony, Cobb sought to add additional information to the model instruction. Specifically, he sought to add the following factors for the jury to consider: (1) whether the witness was under the influence of drugs or alcohol; (2) whether the witness had adequate

time to observe the offender and whether that observation was hindered by lack of lighting or proximity; and (3) was the witness exposed to identifications made by other witnesses.

**{¶ 42}** This court has stated that, "[a]t this stage of legal development in Ohio, the memory science pertaining to witness identification is the proper subject for expert testimony rather than the use of additional or disputed jury instructions." *State v. Pettiford*, 2019-Ohio-892, ¶ 84 (2d Dist.). We further have held that when such expert testimony is presented, the court may not present an instruction "that appears to support or not support such testimony[.]" *State v. Rac*, 2019-Ohio-893, ¶ 37 (2d Dist.).

**{¶ 43}** Here, we cannot say the trial court abused its discretion by declining to enhance the model instruction. This case did not involve identifications by witnesses whose only connection with the defendant was the witnesses' observation of the offense. Instead, this case involved two witnesses who were familiar with Cobb prior to the offense. C.G. testified she had encountered Cobb at least 20 times prior to the shooting. Indeed, C.G. had spoken face-to-face with Cobb the day before the shooting. S.S. took a picture of Cobb the day after the offense to provide to the police. Under the circumstances of this case, we cannot conclude that the trial court abused its discretion by providing the jury the standard OJI eyewitness instruction.

**{¶ 44}** The fifth assignment of error is overruled.

## VI. Suppression of Evidence

**{¶ 45}** The sixth assignment of error states:

THE TRIAL COURT ERRED IN RULING THAT STATEMENTS

MADE BY APPELLANT TO POLICE ON THE MORNING OF JULY 22, 2023, WERE NOT OBTAINED IN VIOLATION OF MIRANDA RIGHTS.

**{¶ 46}** Cobb claims statements he made to Officer Miller and Detective Hofacker at the apartment complex several hours after the shooting should have been suppressed because the officers did not advise him of his *Miranda* rights before questioning him. In support, he argues that he was in custody when he was seated in the back of Miller's police cruiser.

**{¶ 47}** "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.), quoting *State v. Burnside,* 2003-Ohio-5372, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

**{¶ 48}** In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court adopted procedural safeguards to secure the Fifth Amendment's constitutional guarantee against self-incrimination. *Miranda* warnings are required "when an individual is taken into custody or otherwise deprived of his freedom in any significant way and is subjected to questioning." *Id.* at 478. "Questioning alone does not trigger the requirement; the subject must also be in custody. . . . Only a custodial interrogation

triggers the need for a *Miranda* rights warning." *State v. Goodspeed*, 2004-Ohio-1819, ¶ 21-22 (2d Dist.), citing *State v. Biros*, 78 Ohio St.3d 426 (1997), and *Berkemer v. McCarty*, 468 U.S. 420 (1984).

{¶ 49} "In order to determine if a person is in custody for purposes of *Miranda*, the court must determine whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." (Citations omitted.) *State v. Moody*, 2012-Ohio-3390, ¶ 12 (2d Dist.). "A seizure equivalent to an arrest exists where there is: (1) an intent to arrest, (2) the seizure is made under real or assumed authority, (3) accompanied by an actual or constructive seizure of the person, and, (4) which is so understood by the person arrested." (Citations omitted.) *Id.* at ¶ 13. "A seizure is an arrest . . . if a 'reasonable person' in the suspect's position would have understood the situation to constitute a restraint on his freedom of movement of the degree the law associated with formal arrest." (Citations omitted.) *Id.*

{¶ 50} "The factors a court should consider in applying this reasonable person test include whether the encounter takes place in surroundings that are familiar to the suspect; the number of law enforcement officers present, as well as their conduct and demeanor; the degree of physical restraint imposed; and the duration and character of the interrogation." *State v. Magnone*, 2016-Ohio-7100, ¶ 23 (2d Dist.), quoting *State v. Farrell*, 1999 WL 812249, *3 (2d Dist. Oct. 8, 1999).

{¶ 51} In this case, when Det. Hofacker spoke to Shantae Allen about conducting a search of her apartment, he asked her whether anyone was in the apartment. Allen indicated that her children and a male friend of her brother were inside. Hofacker asked

her to go back inside to get her children and to tell the male, later identified as Cobb, to exit the apartment. Hofacker indicated that he had not realized another man would be in the apartment because Abraham Dennis, who was the primary person of interest in the shooting based upon his ownership of the repossessed vehicle, had been taken to the Safety Building for questioning.

{¶ 52} When Cobb exited the apartment, Hofacker introduced himself and asked Cobb to have a seat in the back of Off. Miller's cruiser. Hofacker testified that he wanted to ask Cobb questions to determine whether he was a witness to the offense. Cobb was not handcuffed, and he was informed that he was not under arrest. As Miller was verifying Cobb's identification, Cobb stated that he had not been at the Lakeview Estates complex when the shooting occurred but, upon being informed of the shooting, he had returned home. Miller learned that Cobb possibly had an active arrest warrant issued in Kettering. When he was asked about the warrant, Cobb stated that it had been resolved. Miller did not ask Cobb any further questions.

{¶ 53} While Miller worked to confirm the status of the warrant, Hofacker informed Cobb that he would not ask any questions about the warrant. Hofacker also informed Cobb that he was not required to talk to him and that he would end the interview if Cobb wanted. Hofacker then asked Cobb whether he had witnessed the shooting. Cobb indicated that he had not been home at the time of the shooting and only returned to the apartment after learning about the shooting.

{¶ 54} Hofacker then asked Cobb questions about Abraham Dennis. Cobb responded that Dennis stayed in the apartment and that he was Shantae Allen's friend.

Cobb also indicated that Dennis had just bought a Chevy. He stated that Dennis had been at the apartment during the shooting but had been taken away by the police. Cobb also told Hofacker that there were no guns in the apartment. At some point, Miller determined that there was no active arrest warrant for Cobb, and the encounter ended.

{¶ 55} From our review of the record, we conclude that the statements Cobb made to Off. Miller were spontaneous rather than the result of questioning by Miller. "A suspect who volunteers information, and who is not even asked any questions, is not subject to a custodial interrogation and is not entitled to *Miranda* warnings." (Citation omitted.) *State v. Hall*, 2018-Ohio-2321, ¶ 37 (2d Dist.). Thus, we find no error in the trial court's denial of Cobb's request to suppress his statements to Miller.

{¶ 56} Further, "[t]he mere fact that an individual is sitting in the back seat of a police cruiser, with rear doors that do not open from the inside, without more, is not sufficient to establish custody." (Citations omitted.) *Moody,* 2012-Ohio-3390, at ¶ 13 (2d Dist.). "But if the police take actions that would lead a reasonable person in the defendant's position to believe that he was going to be detained indefinitely, the encounter is custodial." (Citation omitted.) *Id.* Here, the interview lasted approximately 11 minutes. During that time Hofacker was seated beside Cobb, Hofacker's door was open, and he had one leg outside of the cruiser. The tone was conversational throughout. No threats or promises were made. Moreover, contrary to Cobb's suggestion at oral argument, the seizure of the cell phone, though a relevant factor, was not a sufficient basis to conclude that Cobb was in custody during Hofacker's questioning. Based upon this record, we cannot conclude that the trial court erred in denying Cobb's motion to

suppress statements he made to Hofacker, as there was no basis to find that a reasonable person in these circumstances would have believed he was under arrest.

**{¶ 57}** The sixth assignment of error is overruled.

## VII.    Merger

**{¶ 58}** The seventh assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT HAVING WEAPONS UNDER DISABILITY DID NOT MERGE WITH THE OTHER OFFENSES.

**{¶ 59}** Cobb contends the conviction for having weapons under disability should have merged with the murder conviction.   In support, he argues that his possession of the gun was solely for the purpose of shooting G.R. and, as such, both crimes were committed with the same animus.

**{¶ 60}** The Fifth Amendment to the United States Constitution provides in relevant part that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."   This protection applies to the states through the Fourteenth Amendment to the United States Constitution.   *Benton v. Maryland*, 395 U.S. 784, 794 (1969). The Ohio Constitution, Article I, Section 10 also provides double jeopardy protection to Ohio citizens. *State v. Ruff*, 2015-Ohio-995, ¶ 10. The prohibition against double jeopardy protects citizens from a second prosecution for the same offense and against multiple punishments for the same offense.   *Id.*

**{¶ 61}** In Ohio, the double jeopardy protection for multiple punishments has been

codified at R.C. 2941.25 as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 62} In the past, the Ohio Supreme Court has created several different tests to use when making a decision regarding merger. The most recent test is set forth in *Ruff*:

> [W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three simple questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?   An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 31.

{¶ 63} Cobb cites *State v. Fairman*, 2011-Ohio-6489 (2d Dist.) in support of his

argument for merger. In *Fairman*, we recited the following factual history:

> Late one evening in April 2010, Zebonia English was driving in her van with Davares Pruitt in the front passenger seat and an intoxicated Fairman in the back. English made a stop at her home. She briefly went inside the house, while the two men waited for her in the van.
>
> Tremayne Arnold, who was at a barbeque at the home of the Ziles, a couple of houses down, was going to get a ride from English. When English opened the back door of her van, Fairman saw Arnold. Fairman began yelling at Arnold, insulting him and accusing him of having murdered Fairman's nephew. Arnold denied having killed anyone. English decided to take Fairman home and then return for Arnold. However, when she tried to close the door, Fairman blocked it with his foot. English and Channa Worsley, who had also been at the barbeque, tried to move Arnold away from the van, but they were unable to do so.
>
> Arnold and Worsley heard Fairman asking Pruitt for a gun, but Arnold made no attempt to leave the scene. At first Pruitt refused, but then Arnold saw Pruitt hand a gun to Fairman, who shot Arnold in the chest. Witnesses agreed that Fairman and Pruitt left the scene together. Arnold is the only witness who saw the shot being fired. Minutes before the shooting, English's mother had seen a gun in the front passenger seat where Pruitt had been seated, but she did not see anyone holding or firing the gun.

*Id.* at ¶ 3-5.

{¶ 64} We held that "[u]nder the facts of this case, Fairman's act of using a gun to commit Felonious Assault necessarily constituted his commission of Having Weapons Under Disability. Furthermore, the crimes were not committed separately or with a separate animus because the evidence shows that Fairman obtained the gun with the immediate intent of shooting Arnold; he had no separate animus in acquiring possession of the gun. Therefore, we conclude that Fairman's Felonious Assault and Having Weapons Under Disability convictions are allied offenses of similar import that should have been merged." *Id.* at ¶ 67. We also specifically noted that our conclusion was limited to the specific facts set forth in that case. *Id.* at ¶ 68.

{¶ 65} Here, the evidence established that Cobb was in possession of the gun when he crossed the parking lot and confronted G.R. Further, there was no evidence that Cobb's sole intention in confronting G.R. was for the purpose of shooting him. Indeed, it can be inferred that Cobb's immediate intent was to seek the return of his belongings that were in the Chevy and that Cobb decided to pull out his gun and shoot G.R. only after G.R. refused to grant him access to the items in the vehicle. Thus, the trial court could have reasonably concluded that the crimes were committed separately and with a separate animus.

{¶ 66} Based upon the facts herein, we conclude that the trial court did not err in denying Cobb's request to merge the conviction for having a weapon under disability with the murder conviction. Therefore, the seventh assignment of error is overruled.

## VIII.    Firearm Specification Sentencing

{¶ 67} Cobb's eighth assignment of error states:

THE TRIAL COURT ERRED IN IMPOSING TWO THREE YEAR TERMS OF IMPRISONMENT FOR FIREARM SPECIFICATIONS.

{¶ 68} Cobb claims the trial court should not have imposed terms of imprisonment for two firearm specifications: the one attached to the murder conviction and the one attached to its predicate conviction for felonious assault. However, he admits that the Ohio Supreme Court has held that a trial court has the authority, as set forth in R.C. 2929.14(B)(1)(g), to impose consecutive sentences for specifications attached to merged offenses. *State v. Bollar*, 2022-Ohio-4370. Thus, Cobb raises this argument "in the event *Bollar* is overturned so this argument is preserved and not deemed waived."

{¶ 69} As Cobb concedes, *Bollar* is controlling law by which this court is bound. As such, the eighth assignment of error is overruled.

### IX. Consecutive Sentencing

{¶ 70} For his ninth assignment of error, Cobb states:

THE TRIAL COURT ERRED IN ORDERING THE HAVING WEAPONS UNDER DISABILITY SENTENCE TO BE SERVED CONSECUTIVELY TO THE MURDER SENTENCE.

{¶ 71} Cobb challenges the trial court's imposition of consecutive sentences.

{¶ 72} When multiple prison terms are imposed, Ohio law presumes those sentences will be served concurrently rather than consecutively. R.C. 2929.41(A). However, R.C. 2929.14(C)(4) permits the imposition of consecutive sentences if the trial

court makes the findings prescribed by the statute. Specifically, the trial court must find that: (1) "the consecutive service is necessary to protect the public from future crime or to punish the offender"; (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and (3) one or more of the following three findings is made:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 73} "[W]here a trial court properly makes the findings mandated by R.C. 2929.14(C)(4), an appellate court may not reverse the trial court's imposition of consecutive sentences unless it first clearly and convincingly finds that the record does not support the trial court's findings." *State v. Withrow*, 2016-Ohio-2884, ¶ 38 (2d Dist.).

Under R.C. 2953.08(F), the "record" includes, among other things, any presentence or other report submitted to the trial court, the trial record in the case, and any oral or written statements made by or submitted to the trial court at the sentencing hearing. The clear-and-convincing standard requires "a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 74} Cobb acknowledges that the trial court made the requisite findings for consecutive sentences. However, he claims the record does not support the imposition of consecutive sentences.

{¶ 75} The record demonstrates that Cobb had a lengthy criminal history. He had two juvenile delinquency adjudications for acts that, had he been an adult, would have constituted theft offenses. As an adult, he had 11 misdemeanor convictions, including improper handling of a firearm and using weapons while intoxicated. Cobb had 15 traffic convictions. Further, he was convicted of trafficking heroin in 2011 and possession of heroin in 2013. In 2016 he was convicted of having a weapon under disability and possession of cocaine. Finally, in 2021, Cobb was convicted of having a weapon under disability. This history was sufficient to support a finding that consecutive sentences were necessary to protect the public from future crime by the offender.

{¶ 76} We are not persuaded the record demonstrates the trial court's findings were not clearly and convincingly unsupported by the record. Accordingly, the ninth assignment of error is overruled.

## X. Conclusion

**{¶ 77}** All of Cobb's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, J. and HANSEMAN, J., concur.