[Cite as *State v. Hix*, 2025-Ohio-5656.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30504 |
| Appellee | : | |
| | : | Trial Court Case No. 2024 CR 00103 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JACOB HIX | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on December 19, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,


_____
RONALD C. LEWIS, JUDGE

EPLEY, P.J., and HANSEMAN, J., concur.

DAVID R. MILES, Attorney for Appellant
ANDREW T. FRENCH, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Jacob Hix appeals from his conviction for aggravated robbery in the Montgomery County Common Pleas Court following a jury trial. For the following reasons, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 2} On February 22, 2024, Hix was indicted by a Montgomery County grand jury on one count of aggravated robbery (serious physical harm), in violation of R.C. 2911.01(A)(3), a felony of the first degree; one count of grand theft (motor vehicle), in violation of R.C. 2913.02(A)(1), a felony of the fourth degree; and one count of receiving stolen property (motor vehicle), in violation of R.C. 2913.51(A), a felony of the fourth degree. Hix entered a plea of not guilty, and the case proceeded to a jury trial.

{¶ 3} Prior to the presentation of evidence, the parties entered several stipulations, which were provided to the jury. The stipulations included agreeing to the authenticity of the 911 call made on January 10, 2024, at 8:33 a.m. by B.G., the authenticity of Dayton Police Department body worn camera footage from Detective Melissa Boyes, Officer Joseph Ma, and Officer Shana Newell, the identity of the owner of a Chevrolet Trax involved in the case, and the authenticity of Ring video camera footage obtained from 22 Meridian Street on January 10, 2024. The following testimony was presented at trial.

{¶ 4} B.G. testified that she lived on Monmouth Street in the City of Dayton with her husband, father-in-law, son, and grandson. Her house was in a residential neighborhood

2

with street parking. On January 10, 2024, around 8:30 a.m., B.G. was getting ready to take her grandson to school. She started her car, a gray 2016 Chevrolet Trax, to warm it up because it was cold and snowing outside. She left her car running and went inside the house to tell her grandson it was time to go. As B.G. walked back outside onto her porch, she saw the driver's side door of her car open and someone climb into her car. She screamed at the man to stop and ran to her car to stop him from stealing it. B.G. was behind her vehicle when the thief put the car in reverse and knocked B.G. to the ground. B.G. estimated the thief was driving 5 to 10 miles per hour when he hit her right shoulder causing an injury. The thief then drove off toward Third Street and B.G. called the police.

{¶ 5} When police arrived, B.G. declined any medical treatment but told officers she was sore and had leg and hip pain. Although she did not complain of shoulder pain at that time, she later contacted her orthopedic surgeon due to the pain in her shoulder. He ordered an MRI for her right shoulder. There was severe tendon damage, and she had surgery on her right shoulder in March 2024. Following the surgery, B.G. underwent therapy but continued to have pain in her arm through the time of trial. B.G. acknowledged she had issues with her left shoulder previously but denied having an issue with her right shoulder prior to the January 10, 2024 incident. The injury to B.G.'s right shoulder was more severe than the issues she had previously had with her left shoulder.

{¶ 6} B.G. and her husband had just purchased the Trax from JD Byrider ("Byrider") two weeks prior to the theft. There was only one key for the vehicle, and no copies had been made. B.G. did not know the man who took her car, and he did not have permission to take it. B.G. identified the person who stole her car as wearing a black hoodie over his head and maybe a black jacket. She could not identify any other characteristics about the thief.

3

**{¶ 7}** B.G.'s vehicle was recovered undamaged a few hours later. Nothing was missing from the vehicle. B.G. did not know Hix and he did not have permission to take the Trax.

**{¶ 8}** B.G.'s son, J.G., testified that his parents only owned one vehicle, the 2016 Chevrolet Trax. B.G. generally took J.G.'s son to school each day because J.G. did not own a vehicle and he had to work.

**{¶ 9}** On January 10, 2024, B.G. was going to take her grandson to school. After she started up the Trax, she came back inside the house. As she was on her way back out the door, a man wearing a black hooded sweatshirt and jeans jumped into the driver's seat of the Trax. The man put the car in reverse and backed into B.G. then drove off. J.G. was standing at the front door, about 15 feet away from the car, when he saw his mother get hit by the car. The car had been parked in front of the house on the street when it was stolen.

**{¶ 10}** The police responded to the home about 12 minutes later. Once the police arrived, J.G. called Byrider to get the LoJack app to track the Trax's GPS location. LoJack is a downloadable app on the phone that can track the location of the vehicle using a GPS tracking system. The app showed the location of the vehicle, where it had been, how long it had been there, and the time of travel each time the car was started. J.G. explained that to track the vehicle using LoJack, there had to be a police report indicating the car was stolen. The police could also use LoJack to track the vehicle.

**{¶ 11}** J.G. borrowed his grandfather's car to track the Trax himself using the LoJack app. J.G. was on the phone with his sister who relayed the location of the stolen vehicle as it was tracked on the app. The Trax was discovered on Davis Avenue, just off Huffman Avenue, approximately 15 to 20 minutes after it was stolen.

4

{¶ 12} The vehicle was stolen with the only key fob the family had to the vehicle, and the key fob was missing. After the car was located, it took about 30 to 45 minutes before the key fob was found. Officers located it in the parking lot of a store on Huffman Avenue. The vehicle was returned to the family approximately two hours after it had initially been stolen.

{¶ 13} Dayton Police Officer Jessica Harris testified that on January 10, 2024, she was working the 7:00 a.m. shift on the east side of Dayton with her field training officer Michael Conrads. Officer Conrads was driving their marked patrol car when they were advised to look for a vehicle that had been stolen. The officers looked for a silver Chevrolet Trax in the area of Meridian Street on the east side of Dayton.

{¶ 14} The officers received real time updates as they searched for the stolen vehicle. Over the radio, they were informed that Dayton Police Detective Boyes had seen a person, later identified as Hix, and that he was chasing him. Officers Harris and Conrads pulled onto Huffman and saw Detective Boyes come around the corner chasing Hix. Officer Harris did not observe Hix throw anything. Officers Harris and Conrads got out of their vehicle and helped detain Hix. Once Hix was detained, Officer Harris drove to where the stolen vehicle was located and secured it to prevent any tampering.

{¶ 15} J.G. subsequently arrived to retrieve the vehicle, but he could not start it because there was no key fob available. Officers searched the area where Detective Boyes said that she had run after Hix. When they were on Huffman Avenue, they located the key fob inside a fenced yard about five feet away from where Hix had been apprehended. It was very cold outside and raining, so when the key fob was located, it was wet and could not be fingerprinted. Officer Harris verified that the key fob belonged to the stolen Trax and turned it over to J.G.

5

{¶ 16} Doctor Daniel Dunaway was an orthopedic surgeon for Kettering Health Network. Dr. Dunaway testified that B.G. was under his care for several years. She had issues with her left shoulder in the past and had a tear in her left rotator cuff, which had required surgery a year or two previously. On February 1, 2024, B.G. had an office visit regarding an injury she sustained to her right shoulder. Dr. Dunaway had seen B.G. once or twice in the preceding six months at which time B.G. had complained of right shoulder pain and was diagnosed with rotator cuff tendonitis. On February 1, B.G. presented with rotator cuff disease, which was the muscle that controlled her ability to rotate her shoulder and was diagnosed with rotator cuff tendonitis. The injury was an exacerbation of what she had previously had in her right shoulder. Dr. Dunaway did not observe any other injuries to B.G. such as bruises. An MRI confirmed B.G. had a tear in her bicep tendon. Dr. Dunaway performed surgery on B.G.'s right shoulder on March 12, 2024.

{¶ 17} At the time of B.G.'s surgery, Dr. Dunaway discovered that B.G. had a partial tear to the bicep, a partial tear of the rotator cuff tendon, and a tear of the labrum, which is cartilage. Dr. Dunaway performed the surgery on B.G. arthroscopically with small incisions. He used sutures to repair the torn fibers of the tendon, conducted a bicep tenotomy to B.G.'s bicep, and trimmed the torn area of the labrum. The bicep tear was in the right shoulder area next to the rotator cuff tendon.

{¶ 18} Dr. Dunaway opined that, hypothetically, if a person had been hit in the right arm or shoulder by a moving automobile and presented with the type of injury that B.G. had, the tear, like the one found in B.G.'s shoulder, or an exacerbation of a tear could have been caused by the collision. Dr. Dunaway stated that although tendon damage could occur naturally over time, an injury could speed up the process of damage.

{¶ 19} Joseph Ma testified that he had been an officer with Dayton Police Department for about a year-and-a-half and had previously worked for the City of Union Police Department and a sheriff's office. In 2024, Officer Ma was assigned to the east side of Dayton and worked the day shift from 7:00 a.m. until 5:00 p.m. On January 10, 2024, he was working in a two-man crew with his field training officer. Around 9:00 a.m., the officers were notified of a stolen silver Chevrolet Trax that may have struck someone.

{¶ 20} Officer Ma and his training officer responded to B.G.'s home on Monmouth Street and spoke to B.G. and her son. B.G. advised that her Trax had been stolen by someone with dark hair. B.G. stated she was sore but did not request an ambulance. The owners advised that the Trax had recently been purchased and had a 40-day tag on the front. Because it was a recent purchase, there was a security feature that could be used to locate the vehicle. The owners provided a phone number to contact a tracking company. Although B.G.'s phone number was originally used to track the vehicle, the information was switched to Officer Ma's phone. Officer Ma was provided live updates of the GPS location of the vehicle, which he conveyed to other Dayton police crews over the radio. Officer Ma and his field training officer drove in the direction of the stolen vehicle and continued to call out the tracking directions to other officers. The tracking information indicated that the stolen vehicle started out on Monmouth Street and went to an address near Burkhardt Road, directly across from a Speedway gas station. The stolen vehicle then went back toward the area of Huffman Avenue.

{¶ 21} Dayton Police Detective Melissa Boyes testified that she had been a detective for about seven years and was assigned to handle property crimes that occurred on the east side of Dayton. On January 10, 2024, Detective Boyes was at her desk at police headquarters and overheard radio traffic about a grand theft of a motor vehicle in progress.

7

She heard officers over the radio indicate that they were tracking the stolen vehicle with a LoJack system, which was a GPS tracker that provided the location of the vehicle.

{¶ 22} Detective Boyes started to respond to Monmouth when she heard an update that the vehicle tracker pinged the vehicle at 4970 Burkhardt Road, which was a Speedway gas station. Detective Boyes drove an unmarked police car toward the Speedway gas station to look for the stolen car. On her way to the Speedway, additional updated ping locations were tracked to Haviland Avenue, Linden Avenue, and Davis Avenue. Detective Boyes observed the stolen vehicle parked on Meridian Street near 233 Davis Avenue where it last pinged.

{¶ 23} No one was inside the stolen vehicle, but Detective Boyes saw a man, later identified as Hix, walking on Meridian Street away from the vehicle. Hix was wearing dark jeans, a dark hoodie, and a jacket. Hix was looking over his right and left shoulders in her direction. No one else was in the area. Detective Boyes followed Hix in her car for 10 to 15 seconds. At the intersection of Meridian Street and Huffman Avenue, Hix crossed diagonally, which was a jaywalking violation. Detective Boyes stepped out of her car to talk to Hix and told him to come over to her. Hix turned toward her and said "no." Hix then ran away from Detective Boyes, who chased after him. While running away, Hix threw a Speedway cup to the ground. The Speedway cup contained a brown liquid and was later photographed and collected. Detective Boyes's body worn camera reflected that she got out of her cruiser to speak to Hix at 9:27 a.m.

{¶ 24} Detective Boyes was wearing a tactical vest with "Dayton Police Department" written on the front and back, a name badge on her vest, a metal badge on her hip, and her firearm in plain sight. She radioed officers in the area with updated directions of where Hix

8

was running and they were able to apprehend him on the 900 block of Huffman Avenue. No items of interest were found on his person.

{¶ 25} Once Hix was taken into custody, he was *Mirandized* and questioned about the stolen vehicle. Hix denied any involvement in the theft of the vehicle. He claimed that he ran because he was chased by two black males and he was scared. Detective Boyes, a white female, had not seen anyone else in the area when Hix fled.

{¶ 26} While Detective Boyes spoke with Hix, other officers searched for the missing key fob to the stolen vehicle. Officer Harris located the key fob in the front yard of an address on Huffman Avenue, just inside a chain link fence, about 5 to 10 feet away from where Hix had been arrested. No fingerprints or DNA were collected from the key fob because it was wet. Officers verified the key fob went to the stolen vehicle and turned the car over to the family. Detective Boyes elected not to fingerprint the vehicle before turning it over to the owners.

{¶ 27} Detective Boyes spoke to a neighbor across the street from where the stolen vehicle was found parked on Meridian Street. She had observed a Ring doorbell camera affixed to the front of the house. The homeowner allowed Detective Boyes to take a recording of the surveillance video from that morning showing the stolen vehicle being parked. In the video, a man fitting the description of Hix could be seen getting out of the driver's seat of the stolen vehicle after parking it at 9:25 a.m. He was wearing the same kind of clothes in the video that Hix was wearing when he was arrested. He then left the area walking toward Huffman Avenue.

{¶ 28} Later that same day, Detective Boyes went to the Speedway on Burkhardt Road and spoke to the clerks. Someone matching Hix's description had been in the Speedway and purchased a coffee and a couple of breakfast sandwiches. The clerks

9

noticed that the individual was missing some fingers. Upon reviewing surveillance video, Detective Boyes observed Hix entering the Speedway at 9:02 a.m. wearing the same outfit in which he had been arrested. There were no videos or photographs of Hix operating the stolen vehicle at Speedway. The Speedway did not have cameras on the rear of their building.

{¶ 29} Detective Boyes identified a map of the various LoJack pinged locations and route of the stolen vehicle. The stolen vehicle initially was located on Monmouth at B.G.'s address. Hix's criminal history revealed that he had a prior address a few houses away from B.G.'s address. The LoJack tracked the vehicle from Monmouth to Third Street where it turned right. The vehicle then travelled to 4970 Burkhardt Road, which was the Speedway gas station. It then drove back down Burkhardt Road to Haviland Avenue, to Linden Avenue, and then to Davis Avenue. Ultimately, the vehicle stopped on Meridian Street near Huffman Avenue, which is where Detective Boyes first observed Hix.

{¶ 30} Detective Boyes spoke to B.G. a day or two after the incident and again on a later date to obtain a release for B.G.'s medical records. She did not speak to B.G.'s neighbors or seek videos of the theft of the vehicle from any of the neighbors. Detective Boyes did not do a photo lineup to see if B.G. could identify Hix as the thief.

{¶ 31} Tiffani Bishop, an employee at Byrider, testified that B.G.'s husband purchased the 2016 Chevrolet Trax on January 2, 2024. The purchase included the optional LoJack Go service, which was a GPS placed on the vehicle in the event that the vehicle was taken without the owner's consent. If a vehicle were stolen, the owner could call Byrider to get the GPS location of the vehicle, or they could use an app to track it. Byrider used the LoJack service internally to track vehicles in the event of repossession. Of the 450 to 500 cars sold each year in the Dayton area, Byrider used LoJack to repossess

about 50 of them. The LoJack system was frequently used internally by Byrider, not just to repossess vehicles, but also to track down the purchasers.

{¶ 32} The jury found Hix guilty as charged. At sentencing, the trial court merged all three counts into one count of aggravated robbery and imposed an indefinite term of a minimum of three years to a maximum of four and one-half-years in prison. Hix timely appealed.

## II. Manifest Weight and Sufficiency of the Evidence

{¶ 33} In his first assignment of error, Hix argues that his convictions are based upon insufficient evidence. Specifically, Hix contends that the State failed to prove his identity as the offender and that the injury to B.G.'s right shoulder was merely exacerbated and does not constitute serious physical harm. In his second assignment of error, Hix contends that his convictions are against the manifest weight of the evidence for the same reasons. Because these arguments are interrelated, we will consider them together.

{¶ 34} Although Hix argues that his convictions on each of the three charges of which he was found guilty are against the sufficiency of the evidence and manifest weight of the evidence, the trial court merged the three offenses at the time of sentencing. "'When a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.'" *State v. Stargell*, 2016-Ohio-5653, ¶ 57 (2d Dist.), quoting *State v. Wolff*, 2009-Ohio-2897, ¶ 70 (7th Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990). Therefore, we will limit our analysis to Hix's conviction for aggravated robbery.

{¶ 35} Whether the evidence presented at trial is legally sufficient to sustain a conviction is a question of law that an appellate court reviews de novo. *State v. Groce*, 2020-Ohio-6671, ¶ 7. "To resolve a sufficiency challenge, we must determine 'whether,

after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKelton*, 2016-Ohio-5735, ¶ 325, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court does not engage in a determination of the witnesses' credibility when reviewing the sufficiency of the evidence. *State v. Goff*, 82 Ohio St.3d 123, 139 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Nor does an appellate court assess whether the evidence admitted at trial should be believed but, rather, if believed, the evidence "would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. "We will not disturb the verdict unless we find that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001), citing *Jenks* at 273.

{¶ 36} In contrast to a sufficiency challenge, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "A reviewing court considering a manifest-weight claim 'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.'" *State v. Group*, 2002-Ohio-7247, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should be reversed as being against the manifest weight of the evidence only "'in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 37} Sufficiency and manifest weight of the evidence are quantitatively and qualitatively different legal concepts. *Thompkins* at paragraph two of the syllabus. "'Although sufficiency and manifest weight are different legal concepts, manifest weight may

subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.'" *State v. Cobb*, 2025-Ohio-1274, ¶ 18 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). Consequently, "'a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Farra*, 2022-Ohio-1421, ¶ 51 (2d Dist.), quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

### a. Identity

{¶ 38} "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime." *State v. Tate*, 2014-Ohio-3667, ¶ 15. "Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *Id*., citing *Jenks*, 61 Ohio St.3d at 272-273.

{¶ 39} Hix is correct that no fingerprint or DNA evidence was submitted at trial. Nor were B.G. or J.G. able to personally identify him as the culprit. Nevertheless, we conclude there was sufficient evidence presented that a rational trier of fact could have found that Hix was the perpetrator beyond a reasonable doubt and that finding is not against the manifest weight of the evidence.

{¶ 40} B.G. observed an individual wearing a black hoodie with the hoodie up and black jacket steal her car around 8:30 a.m. on January 10, 2024. J.G. likewise observed a man wearing a black hooded sweatshirt and jeans steal the Trax. B.G. saw the stolen vehicle drive down Monmouth and turn right onto Third Street. After police arrived, J.G. contacted Byrider to start tracking the vehicle using the LoJack system. The vehicle tracking showed that the vehicle started on Monmouth, drove north to Third Street and turned east. The vehicle stopped at 4970 Burkhardt Road, which was a Speedway gas

13

station.   Surveillance footage showed Hix entering the Speedway gas station at 9:02 a.m. wearing dark jeans, a dark hoodie with the hoodie up, and a black jacket over his hoodie. The clerks indicated that Hix, who was missing some fingers, purchased a coffee and some breakfast sandwiches.   When Hix ran from Detective Boyes less than a half hour later, she saw Hix throw a Speedway cup with brown liquid in it to the ground, which was photographed and collected.

{¶ 41} After leaving the gas station, the LoJack system tracked the stolen vehicle west on Burkhardt Road and pinged the vehicle's location on Haviland Avenue, Linden Avenue, and Davis Avenue, eventually coming to a stop at Huffman Avenue and Meridian Street.   The vehicle was located by police on Meridian Street.   A Ring doorbell video recovered from a home on Meridian Street across the street from where the stolen vehicle was recovered showed a man, consistent with Hix's description, parking the stolen vehicle at 9:25 a.m., getting out of the driver's seat, and walking away toward Huffman Avenue.   No other individuals could be seen exiting the stolen vehicle.   The driver of the stolen vehicle was wearing dark pants, a black hoodie, and a black jacket.

{¶ 42} Detective Boyes observed Hix walking away from the stolen vehicle on Meridian Street toward Huffman Avenue glancing over his shoulder looking back at her.   No other individuals were present in the area.   Detective Boyes stopped her cruiser to speak to Hix at 9:27 a.m., after having watched him walk away from the direction of the stolen vehicle for 10 to 15 seconds.   When Detective Boyes asked Hix to stop, he said "no," and took off running on Huffman Avenue.   He was subsequently caught and arrested wearing dark jeans, a black hoodie, and a black jacket.   Although the key fob was not found in Hix's possession, the key fob was recovered approximately 5 to 10 feet away from where Hix was arrested.

14

{¶ 43} Viewing this evidence in a light most favorable to the State, a reasonable trier of fact could find beyond a reasonable doubt that Hix was the perpetrator who stole the 2016 Chevrolet Trax from B.G. on Monmouth, drove the vehicle to Speedway, and parked it on Meridian Street.   We likewise conclude that the jury did not lose its way in finding that Hix was the perpetrator.

### b.  Serious Physical Harm

{¶ 44} Hix was convicted of aggravated robbery in violation of R.C. 2911.01(A)(3). Therefore, the State had to prove that in attempting or committing a theft offense, or in fleeing immediately after the attempt or offense, Hix inflicted or attempted to inflict serious physical harm on B.G.   Hix challenges whether B.G. suffered serious physical harm and contends that his conviction should be vacated because the State failed to demonstrate that B.G. incurred serious physical harm.   Alternatively, Hix asks this court to conclude that only physical harm occurred and reduce his conviction to the lesser included offense of robbery.

{¶ 45} "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

15

R.C. 2901.01(A)(5).

{¶ 46} B.G. testified that when she saw Hix stealing her car, she ran to her car to stop him. B.G. was behind her vehicle when Hix put the car in reverse and knocked B.G. to the ground. The vehicle struck B.G.'s right shoulder causing an injury. Both her hip and her leg were also sore. B.G. testified that although she declined medical treatment on the day of the offense, she continued to have pain in her right shoulder and contacted her orthopedic surgeon. An MRI was performed on her shoulder, which showed severe tendon damage. B.G. had surgery on her right shoulder in March 2024. Following the surgery, B.G. underwent physical therapy but continued to have pain in her arm through the time of trial, more than a year after the incident. B.G. denied having an issue with her right shoulder prior to the January 10, 2024 incident.

{¶ 47} B.G.'s orthopedic surgeon testified that on February 1, 2024, B.G. had an office visit regarding an injury she sustained to her right shoulder. Dr. Dunaway had seen B.G. once or twice in the preceding six months at which time B.G. had complained of right shoulder pain and was diagnosed with rotator cuff tendonitis. B.G. presented with rotator cuff disease and was diagnosed with rotator cuff tendonitis. The January 2024 injury was an exacerbation of what B.G. had previously had in her right shoulder. An MRI confirmed B.G. had a tear in her bicep tendon, and Dr. Dunaway performed surgery on her right shoulder on March 12, 2024.

{¶ 48} At the time of B.G.'s surgery, Dr. Dunaway discovered that B.G. had a partial tear to the bicep, a partial tear of the rotator cuff tendon, and a tear of the labrum, which is cartilage. He repaired the torn fibers of the tendon, conducted a bicep tenotomy, and trimmed the torn area of the labrum.

16

{¶ 49} Dr. Dunaway testified that, hypothetically, if a person had been hit in the right arm or shoulder by a moving automobile and presented with the type of injury that B.G. had, the tear, like the one found in B.G.'s shoulder, or an exacerbation of the tear could have been caused by the collision. Dr. Dunaway stated that although tendon damage could occur naturally over time, an injury could speed up the process of damage.

{¶ 50} "A jury is free to believe all, part, or none of a witness' testimony." *State v. Hutchinson*, 2010-Ohio-5752, ¶ 33 (2d Dist.). Based on this evidence, the jury could reasonably find that Hix caused serious physical harm to B.G.'s right shoulder when he struck her with the Trax. The evidence supports the finding that the physical harm to B.G. involved acute pain that resulted in substantial suffering or involved any degree of prolonged or intractable pain. R.C. 2901.01(A)(5)(e). The jury did not clearly lose its way or create a manifest miscarriage of justice by finding that B.G. had suffered serious physical harm.

{¶ 51} Moreover, Hix could be convicted of aggravated robbery under the statute if he inflicted or *attempted* to inflict serious physical harm on B.G. R.C. 2911.01(A)(3). "Our court has stressed that '[w]hether a person commits a robbery or an aggravated robbery is not determined by the condition in which the victim ultimately finds himself. Rather, it turns on the nature of the assailant's actions and the *potential* for serious physical harm to the victim.'" (Emphasis in original.) *State v. Taylor*, 2023-Ohio-1766, ¶ 40 (2d Dist.), quoting *State v. Mcguire*, 1989 WL 159206, *3 (2d Dist. Dec. 27, 1989). Here, Hix reversed the Trax and hit B.G. with the moving vehicle. Hitting someone with a vehicle and knocking them down has the potential for causing serious physical harm, and it did cause such harm here.

{¶ 52} In reviewing this record as a whole, we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice

17

has occurred.   Hix's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence.   Hix's two assignments of error are overruled.

### III.    Conclusion

{¶ 53} Having overruled Hix's assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

EPLEY, P.J., and HANSEMAN, J., concur.